OFFICE OF CONSUMERS' COUNSEL, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

(No. 80-747—Decided May 13, 1981.)

*Mr. William A. Spratley,* consumers' counsel, and *Mr. Richard P. Rosenberry,* for appellant.

*Mr. William J. Brown,* attorney general, *Mr. Marvin I. Resnik* and *Mr. James R. Bacha,* for appellee.

*Ms. Frances McGovern, Mr. Anthony J. Alexander* and *Mr. Michael A. Gribler,* for intervening appellee, Ohio Edison Company.

*Per Curiam.* R. C. 4909.15(A)(1) authorizes the commission to include in a utility's rate base a reasonable allowance for CWIP. The pertinent part of R. C. 4909.15 reads:

"(A) The public utilities commission, when fixing and determining just and reasonable rates, fares, tolls, rentals, and charges shall determine:

"(1) The valuation as of the date certain of the property of the public utility used and useful in rendering the public utility

service for which rates are to be fixed and determined. The valuation so determined shall be the total value as set forth in division (J) of section 4909.05 of the Revised Code, and a reasonable allowance for materials and supplies and cash working capital, as determined by the public utilities commission. The commission may, in its discretion, permit a reasonable allowance for construction work in progress but, in no event, may any allowance for construction work in progress be made by the commission until it has determined, after a physical inspection, that the particular construction project is at least seventy-five per cent complete."

The only other legislative restraint placed upon the commission's authority to permit an allowance for CWIP is R. C. 4909.15(E) which limits the amount of the allowance to 20 percent of the total valuation, excluding the allowance made under R. C. 4909.15(A)(1).

In this appeal, appellant challenges the propriety of the allowance for CWIP for Bruce Mansfield Unit No. 3. The appellant bases its challenge upon essentially three grounds.

Appellant's first challenge raises the question of how the commission is to determine when a particular construction project is at least 75 percent complete. R. C. 4909.15(A)(1) provides that the commission may not permit an allowance for CWIP until it has determined, "after a physical inspection," that the project is at least 75 percent complete.

In reaching its conclusion that Bruce Mansfield Unit No. 3 was more than 75 percent complete, the commission relied on testimony of its staff witness. He testified that his conclusion was based upon a number of criteria, including physical inspection, which played only a minor part, elapsed time test[2] and dollars obligated test.[3] The commission, while acknowledging that a physical inspection must be made prior to the determination, stated that, "in determining how percent completion should be calculated, measurements which do not specifically

---

[2] Under this test, the percentage of completion is determined by measuring the time that has elapsed since the beginning of the project as a percentage of the anticipated time of construction.

[3] The dollars obligated test employs a similar method of establishing the percentage of completion. This test uses dollars rather than time.

recognize that percent completion is a function of elapsed time and obligated capital should be avoided."

On the other hand, appellant argues that the determination of percent completion must be *based* upon a physical inspection. The commission rejected this argument.[4]

We disagree with appellant's proposition. R. C. 4909.15 (A)(1) states that the commission must make its determination *after* a physical inspection. It does not state that the determination is to be based upon the physical inspection. It is uncontroverted that a member of the commission's staff did make a physical inspection of Bruce Mansfield No. 3 during its investigation.

If the General Assembly had intended that the determination be based upon a physical inspection, it would have used that language. Rather, by stating that the determination be made after a physical inspection, the General Assembly decided that the physical inspection was the starting point for such determination.

Therefore, while the commission must make a physical inspection prior to determining the percent which a particular construction project is complete, we hold that R. C. 4909.15 (A)(1) does not require the determination to be based upon a physical inspection.

Appellant's next challenge revolves around the meaning of "particular construction project" in R. C. 4909.15(A)(1). In determining that Bruce Mansfield Unit No. 3 was more than 75 percent complete, the commission's staff witness allocated to Bruce Mansfield Unit No. 3 a pro-rata portion of certain

---

[4] In explaining why the determination of percent completion should not be based upon a physical inspection, the commission stated, as follows:

"Although the statute requires a physical inspection prior to a determination of percent completion, it is patently obvious that a physical inspection cannot lead to a precise quantification of percent completion, particularly where a project of the enormous size, cost and complexity of a generating facility is involved. The Commission finds it revealing, but not in the least surprising, that neither Mr. Schultz or Mr. Lewis [appellant's witnesses] would offer a judgment as to the percent completion of any of the multitude of the unit's components which they inspected. Yet, after a single visit to the site, these witnesses were prepared to state categorically that this project, which includes a generating unit structure the size of a 21-story building, a 400 foot cooling tower, a 600 foot chimney, a massive air quality control system, miles of piping and circuitry, as well as thousands of tons of equipment and materials either on-site or in place, was 62 percent complete at date certain. Nobody is that expert.***"

facilities which it shares with Bruce Mansfield Units Nos. 1 and 2.

The facilities in question are primarily for air pollution control and fuel handling. They are complete and already in the company's rate base.[5] Appellant argues that in making the determination that a particular project is more than 75 percent complete, the commission may consider only those portions of the project which are not already in the rate base.

The commission held that it was proper to allocate a portion of the shared facilities to Bruce Mansfield Unit No. 3. We agree.

Witnesses not only for the company, but also for the appellant, testified that the shared facilities, air pollution control and fuel-handling components, were essential to the operation of Bruce Mansfield Unit No. 3. R. C. 4909.15(A)(1) permits the commission to make an allowance based upon the extent to which "a particular construction project" is complete. The particular construction project in question is a coal-fired generating plant. The allocation by the commission of a pro-rata portion of facilities already in service, which are essential to the operation of the construction project, is a proper application of R. C. 4909.15(A)(1).

Lastly, appellant argues that the commission acted contrary to its own previously established guidelines for allowances of CWIP. Appellant contends that the commission in its previous cases has required that a project be in service at the time the rates become effective, or shortly thereafter. See, e.g., *Columbus & Southern Ohio Electric Co.*, No. 77-545-EL-AIR (March 31, 1978); *Ohio Edison Co.*, No. 77-1249-EL-AIR (November 17, 1978).

The commission argues that it has not established a rule. Rather, the commission maintains that whether a project will be in service at the time the rates go into effect is just one factor it considered in the exercise of its discretion in favor of an allowance for CWIP.

In *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 108, we approved the commission's method for determining which projects qualified for a reasonable CWIP

---

[5] The value of those facilities was not included in the allowance for CWIP. Hence, there was no "double billing" for these items.

allowance. There, the commission determined that only those projects which were completed by the end of the test year or when the rates took effect, qualified for a CWIP allowance. *Id.* at 111. See, also, *C&SOE* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 120, 123-124. However, we also noted that:

"The method adopted by the commission to implement this purpose does not appear unreasonable to this court. The commission acknowledged that the standard applied in this cause does not establish rigid criteria for the future. In resolving this cause, the commission applied the method it believed could achieve a result approximating the intended purpose of the statute. This standard, based as it was on the particular set of facts before the commission, bore a reasonable relationship to the purpose of the legislation***." *Consumers' Counsel, supra,* at 112-113.

Thus, the rigid criteria appellant seeks to impose do not exist. Rather, each determination is to be based upon the particular facts of the case. Here, the determination that Bruce Mansfield Unit No. 3 qualified for a CWIP allowance did not amount to an abuse of discretion.

For the foregoing reasons, the order of the commission as to the allowance for CWIP is affirmed.

*Order affirmed.*

CELEBREZZE, C. J., W. BROWN, P. BROWN, STEPHENSON, HOLMES and C. BROWN, JJ., concur.

LOCHER, J., dissents.

STEPHENSON, J., of the Fourth Appellate District, sitting for SWEENEY, J.

LOCHER, J., dissenting. The Office of Consumers' Counsel, appellant herein, alleges before this court that the Public Utilities Commission erred in its determination that Bruce Mansfield Unit No. 3 was more than 75 percent complete. I must agree with this contention.

The commission is granted, pursuant to R. C. 4909.15(A), the discretion to permit an allowance for construction work in progress (CWIP) in the utility company's rate base. That section provides, in relevant part:

"***The commission may, in its discretion, permit a reasonable allowance for construction work in progress but, in

no event, may any allowance for construction work in progress be made by the commission until it has determined, after a physical inspection, that the particular construction project is at least seventy-five per cent complete."

The commission has recognized that the CWIP allowance, often alleged to be unconstitutional, is a specific exception to the requirement that property must be used and useful at the date certain in order to be incorporated into a utility's rate base. Accordingly, that exception must be strictly construed. See, *e.g.*, *Columbus & Southern Ohio Electric Co.* No. 77-545-EL-AIR (March 31, 1978), affirmed *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 108; *Ohio Edison Co.* No. 77-1249-EL-AIR (November 17, 1978); *Dayton Power & Light Co.* No. 78-92-EL-AIR (March 9, 1979), affirmed *Dayton Power & Light Co.* v. *Pub. Util. Comm.* (1980), 61 Ohio St. 2d 215.

Furthermore, legislative intent is clear on the face of R. C. 4909.15(A)(1). The General Assembly wished to provide utilities an opportunity to integrate into the rate base capital expenditures for construction projects whose future utilization by and benefit to consumers were imminent.

Nevertheless, in this matter, the commission has ignored its own policy and the clear legislative intent of R. C. 4909.15(A)(1). In its determination that Bruce Mansfield Unit No. 3 was more than 75 percent complete, the commission's staff witness allocated a pro rata portion of certain facilities that Bruce Mansfield Unit No. 3 shares with Bruce Mansfield Units Nos. 1 and 2. To allow this "sharing," the CWIP allowance was granted in direct contravention of the requirement in R. C. 4909.15(A)(1) that such allowances be determined through reference to a *"particular* construction project." The particular construction project herein at issue is solely Mansfield Unit No. 3, and not Units Nos. 1 and 2.

Through its application of the shared facility concept, the commission has wrought a strained interpretation of R. C. 4909.15(A)(1). The impact of this approach becomes clear when the commission's interpretation is applied to the facts of this case in conjunction with R. C. 4909.15(E), which limits the CWIP allowance to 20 percent of the total rate base exclusive of the CWIP allowance.

Consider the following undisputed facts: (1) the shared pollution control and fuel-handling facilities have been included in the rate base since 1976, approximately three years prior to the date certain in this case; (2) these shared facilities included *excess capacity* until the Bruce Mansfield Unit No. 3 was completed; (3) without considering the shared facilities, the project would not have been deemed to be 75 percent complete on the date certain; and (4) the cost of the shared facilities was not included in the CWIP allowance for purposes of determining any new additions to the rate base. It is important to note that the *excess capacity* of the shared facilities would be neither used nor useful until Bruce Mansfield Unit No. 3 was completed.[6]

Given these facts, the commission determined that the utility had met the minimum 75 percent completion standard even though it was necessary to include the cost of items which were already in the rate base to do so. Accordingly, the commission created a criterion for determining *eligibility* under R. C. 4909.15(A)(1) which does not appear on the face of the statute. That is, R. C. 4909.15(A)(1) only refers to an *"allowance* for construction work in progress" with the requirement "that the particular construction project***[be] at least seventy-five per cent complete." (Emphasis added.) R. C. 4909.15(A)(1) should be read in *pari materia* with R. C. 4909.15(E) which likewise refers *only* to "an *allowance* for construction work in progress under division (A)(1)." (Emphasis added.)

In this case, the commission, however, has acknowledged a threshold determination regarding CWIP *eligibility. Ohio Edison Co.* No. 78-1567-EL-AIR (January 30, 1980), at page 15. This convoluted reasoning allowed the utility to vault over the 75 percent standard by way of the peculiar procedure of including as construction work in progress some expenditures which had already been in the rate base for several years. Although these expenditures for shared facilities were included in the rate base for purposes of the CWIP eligibility determination, these same expenditures were deliberately excluded from the CWIP *allowance.*

---

[6] This observation causes one to wonder why the commission permitted the cost of the *excess capacity* to be included in the rate base in the first place.

This convenient flip-flop from rate base to CWIP and back to rate base ignores the obvious legislative intent behind R. C. 4909.15(A)(1). The CWIP *allowance* is to prevent inordinate and onerous time delays between capital expenditure and return on capital. Accordingly, the commission's position is self-defeating because it seeks to include the pro rata cost of the shared facilities solely for the purpose of establishing CWIP *eligibility*. If expenditures are part of the rate base and, therefore, cannot and should not be considered for the purpose of a CWIP *allowance,* then those same expenditures must not be considered for the purpose of determining whether the 75 percent completion standard for CWIP *eligibility* has been met. The reasoning behind this observation is clear in light of R. C. 4909.15(E) which limits the CWIP *allowance* to 20 percent of the total rate base. The example which follows demonstrates the hidden effect of the commission's position. It is necessary to use a hypothetical example to show this effect clearly. Likewise, an example is helpful because of the quantitative determinations required under R. C. 4909.15.

Suppose a utility has a total rate base of $150,000,000, and this utility is currently building a new plant at a cost of $30,000,000. $21,000,000 has been spent on the new plant as of the date certain. The new plant, however, can only function with the assistance of a pollution control and fuel-handling facility which is shared with two other plants. This shared facility was completed approximately three years prior to the date certain, and its cost has been improperly included in the rate base since its completion. The portion of this shared facility which is allocable to the new plant is $10,000,000.

In the case before this court, the commission has urged that one criterion for determining whether a utility has crossed the *eligibility* threshold is the percentage of funds expended to date on the project. See *Ohio Edison Co. (1980), supra,* at page 14. If one applies that standard to the example above, the expenditures made exclusively for the new plant would not qualify it for a CWIP *allowance* because $21,000,000 is only 70 percent of $30,000,000. Yet, if the $10,000,000 expended for the portion of the shared facility which is allocable to the new plant is included, then the funds expended to date are $31,000,000 or 77½ percent of a total of $40,000,000.

In this case, the commission gave considerable attention to committed capital in its opinion and order. *Ohio Edison Co., supra,* at page 13. Funds expended, rate base and CWIP *allowance* are admittedly not the exclusive criteria for determining the *eligibility* for a CWIP *allowance* under R. C. 4909.15(A)(1). Nevertheless, these criteria are the determinative factors under R. C. 4909.15(E). In light of R. C. 4909.15(E), the example discussed above demonstrates the insidious effect of the commission's position in this case.

R. C. 4909.15(E) provides, in pertinent part, as follows:

"In no event shall an allowance for construction work in progress under division (A)(1) of this section exceed twenty per cent of the total valuation as stated in such division, not including such allowance."

Accordingly, the CWIP *allowance* under R. C. 4909.15(E) is totally separate and distinct from the rate base and no cross-pollenation exists between the two. The total rate base, net of any CWIP *allowance,* limits the ceiling for a permissible CWIP *allowance.*

Applying the commission's analysis to the example discussed above demonstrates the untenable nature of the commission's position. The total rate base of $150,000,000 includes the $10,000,000 portion of the cost of the shared facility which would only be used and useful when the new plant becomes operational. Having used this $10,000,000 to satisfy the CWIP threshold *eligibility* criterion, these funds remain in the rate base. Therefore, the CWIP *allowance* requested for a rate increase would be only $21,000,000 for the funds expended on the new plant. At first glance, this request appears permissible under R. C. 4909.15(E) because the $21,000,000 expenditure is less than 20 percent of $150,000,000. This result is analogous to that which the commission urges this court to affirm.

Under R. C. 4909.15, however, a different result should obtain in this example. First, the $10,000,000 investment in the shared facility which is allocable to the new plant should never have been included in the rate base because it would be neither used nor useful until the new plant was completed. Therefore, the total valuation should be decreased to $140,000,000. Second, the CWIP *allowance* in this example

should be increased from $21,000,000 to $31,000,000 to include total expenditures for the new plant. Third, the maximum allowable CWIP addition to the rate base would be 20 percent of $140,000,000 or $28,000,000. This contrasts with the commission's approach which allows an additional $3,000,000 to be included in the rate base. This application of R. C. 4909.15 would be consistent with the plain language of R. C. 4909.15 as well as remain true to the obvious legislative intent of that provision.

Rather, the commission's approach permits the utility to benefit doubly. Initially, the utility receives a return on *excess capacity*. Later, the utility may metamorphose its plant in service into construction work in progress—but only for a moment, until the total exceeds the CWIP *eligibility* threshold. Meanwhile, the cost of this excess capacity remains in the rate base. Thereafter, this same cost is subtracted from the CWIP total for the purpose of applying the 20 percent standard under R. C. 4909.15(E) and conceivably permitting a total increase in the rate base in excess of that allowable under this provision. The commission's approach, therefore, provides a gaping loophole through which utilities may drive up the rate base.

Accordingly, the commission's argument says too much. One can readily argue that the commission erred in 1976 by permitting excess capacity to be included in the rate base. Now, the commission wishes this court to acquiesce in the shared facility concept.

The effect of the commission's decision to utilize the shared facility concept results in allocating a portion of used and useful property of completed construction to CWIP in order to reach the magic 75 percent. The statute requires otherwise, as the commission and this court have attempted to uphold in the past.

Unfortunately, the commission's position in this case would undermine the clear meaning and obvious intent of R. C. 4909.15. The commission's ever-expanding reading of the statute opens a pandora's box and circumvents the basic requirement that only expenditures for used and useful property may be included in a utility's rate base. Having done so, the commission then seeks the *imprimatur* of this court. The

shared facility concept now paves the way for utilities to gain an artificially inflated return. Likewise, this case demonstrates the commission's continuing failure to "establish standards for future decision on issues of allowing CWIP in the rate base." *Consumers' Counsel* v. *Pub. Util. Comm., supra* (58 Ohio St. 2d 108) at page 120 (Locher, J., dissenting). This lack of standards permits utilities to lead both this court and the commission down the primrose path to higher utility rates through convenient, *ex post facto* rationalizations. One can only but imagine what new and tortuous roads lie ahead.

Accordingly, this case, in my judgment, should be remanded to the Public Utilities Commission for a recomputation of the rate base, pursuant to a proper application of R. C. 4909.15; and, furthermore, inquiries should be made concerning the reason for including in the rate base in prior years a significant portion (approximately $29,000,000) of the expenditures for property which was neither used nor useful.