**B&T EXPRESS, INC., Appellant,**

v.

**PUBLIC UTILITIES COMMISSION OF OHIO, Appellee.**

[Cite as *B&T Express, Inc. v. Pub. Util. Comm.* (2001), 145 Ohio App.3d 656.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 01AP–154.

Decided Sept. 20, 2001.

*Carlile, Patchen & Murphy LLP* and *Boyd B. Ferris,* for appellant.

*Betty D. Montgomery,* Attorney General, *Duane W. Luckey* and *Matthew J. Satterwhite,* Assistant Attorneys General, for appellee.

LAZARUS, Judge.

Appellant, B&T Express, Inc., appeals from a decision of the Public Utilities Commission of Ohio ("PUCO") upholding civil forfeitures totaling $2,970, which the PUCO's Motor Carrier Safety Division had assessed against B&T.

B&T is a commercial motor carrier operating out of North Lima, Ohio. Between August 19, 1998 and September 23, 1999, the staff of the Ohio Highway Patrol's Commercial Motor Carrier Enforcement Section issued fifteen separate citations to B&T as the result of random inspections of tractor-trailer rigs that were either owned by or being operated on behalf of B&T. Together, the fifteen citations charged B&T with twenty-nine separate violations of Ohio's motor carrier rules and regulations. More specifically, twenty-eight of the twenty-nine violations charged in the citations were of various sections of the Federal Motor

Carrier Safety Regulations ("FMCSRs"), Sections 350–399, Title 49, C.F.R., as adopted by the PUCO as Ohio Administrative Rules. The one other violation for which B&T was cited was of Ohio Adm.Code 4901:2–1–04, pertaining to the availability of tax receipts. Following the issuance of each of the fifteen citations, the PUCO's Motor Carrier Safety Division sent B&T a "NOTICE OF APPARENT VIOLATION AND INTENT TO ASSESS FORFEITURE." The forfeitures proposed in these notices ranged in amounts from $90 to $350. The forfeiture proposed for all fifteen citations totaled $2,970.

B&T contested all fifteen of the citations and the proposed forfeitures. The PUCO consolidated B&T's fifteen citation contests for purposes of conducting a hearing and issuing an order. Following a four-day hearing on B&T's contests, the PUCO issued an order on December 7, 2000, upholding all twenty-nine of the violations with which B&T was charged, and assessing civil forfeitures totaling $2,970 against B&T for the twenty-nine violations. B&T appeals from the PUCO's order assigning the following errors:

"1. The Commission erred in its determination, as set forth in its Entry, dated December 21, 2000, that Sections 4919.99 or 4921.99, Revised Code, authorize the imposition of forfeitures upon B&T in any of the citations involved in this proceeding.

"2. The Commission erred in its determination that the evidence of record in this proceeding supports, as to any alleged violation, a finding that B&T was subject for that violation to either Section 4919.99 or 4921.99, Revised Code.

"3. The Commission erred in its determination at page 6 of its Opinion and Order, dated December 7, 2000, that any federal motor carrier safety regulations were ever properly adopted pursuant to Section 111.15, Revised Code.

"4. The Commission erred in its determination that the federal motor carrier safety regulations which B&T is alleged to have violated, are the same, unchanged, federal rules purportedly adopted by the Commission in June 1998.

"5. The Commission erred in its determination that the laws of the State of Ohio permit the imposition of strict liability upon an employer for the types of violations with which B&T is charged.

"6. The Commission erred in its determination at page 15 of its Opinion and Order, dated December 7, 2000, that B&T violated any regulation authorizing the imposition of a civil forfeiture in any of the citations involved.

"7. The Commission erred in its determination at page 15 of its Opinion and Order, dated December 7, 2000, that the citations were properly issued in a non-discriminatory manner.

"8. The Commission erred in its determination at page 15 of its Opinion and Order, dated December 7, 2000, that the respondent received adequate notice of the regulations alleged to have been violated and the proposed civil forfeitures.

"9. The Commission erred in its determination at page 15 of its Opinion and Order, dated December 7, 2000, that the imposition of civil forfeitures upon B&T in any of the instant proceedings is justified by the 'common law doctrine' of respondeat superior.

"10. The Commission erred in its determination at page 16 of its Opinion and Order, dated December 7, 2000, that the evidence reflects that drivers cited were operating on the highway on behalf of B&T at the time the alleged violations occurred.

"11. The Commission erred in its determination at page 16 of its Opinion and Order, dated December 7, 2000, that the evidence in this proceeding supports any finding that B&T was operating as a 'public utility' for purposes of the application of Section 4905.55, Revised Code, at the time any alleged violation occurred.

"12. The Commission erred in its determination at page 16 of its Opinion and Order, dated December 7, 2000, that all motor carriers conducting operations in Ohio are either motor transportation companies or public utilities, unless the drivers and vehicles were being operated outside the scope of employment or operating for another motor carrier.

"13. The Commission erred in its determination that B&T failed to have in place effective management controls at the time the alleged violations occurred.

"14. The Commission erred in its determination that there exists any evidence that B&T's alleged lax management practices or controls permitted any violations to occur.

"15. The Commission erred in failing to consider the uncontradicted and unrebutted testimony of B&T's President regarding the safety practices of the company and the instructions provided drivers.

"16. The Commission erred in failing to require, as to each alleged violation:

"A. Evidence that the rule alleged to have been violated was a rule adopted properly by the Commission;

"B. Evidence that B&T could have taken any step whatsoever to preclude the particular alleged violation from occurring;

"C. Evidence that the language of the rule alleged to have been violated supported the violation alleged by the Staff;

"D. Evidence that the rule alleged to have been violated is consistent with Ohio statutory requirements.

"17. The Commission erred in failing to consider the statutory requirements set forth in Chapter 4511, Revised Code.

"18. The Commission erred by rendering an arbitrary and capricious decision, which is wholly against the manifest weight of the evidence and in violation of the requirements set forth in Title 49, Revised Code; and in finding that any evidence existed in support of a determination that B&T violated any of the rules alleged herein.

"19. The Commission erred by exceeding its statutory authority."

 Pursuant to R.C. 4919.99(C), 4921.99(C), and 4923.99(C), this court has exclusive original jurisdiction to review, modify, or vacate orders of the PUCO pertaining to motor carriers "in the same manner, and under the same standards, as the supreme court hears and determines appeals under Chapter 4903. of the Revised Code." The standard of review applicable to appeals to the Ohio Supreme Court under R.C. Chapter 4903 is set forth in R.C. 4903.13, which provides:

"A final order made by the public utilities commission shall be reversed, vacated, or modified by the supreme court on appeal, if, upon consideration of the record, such court is of the opinion that such order was unlawful or unreasonable."

The Ohio Supreme Court has consistently interpreted the standard set forth in R.C. 4903.13 to mean that an order of the PUCO will not be reversed or modified as to questions of fact where the record contains sufficient probative evidence to show that the PUCO's determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.* (2000), 88 Ohio St.3d 549, 555, 728 N.E.2d 371. However, the Supreme Court has also consistently recognized that, with respect to questions of law, this standard subjects orders of the PUCO to "complete, independent power of review." *Consumers' Counsel v. Pub. Util. Comm.* (1983), 4 Ohio St.3d 111, 112, 4 OBR 358, 447 N.E.2d 749.

In the interest of judicial economy, B&T's assignments of error will be addressed out of order.

 Together, B&T's third and fourth assignments of error assert that the PUCO's conclusion that B&T committed twenty-eight violations of various sections of the FMCSRs as adopted as Ohio Administrative Rules must be reversed, as PUCO failed to comply with R.C. 111.15 when it adopted the FMCSRs.

The FMCSRs were promulgated pursuant to the Motor Carrier Safety Act of 1984, Sections 31131–31137, 31140–31144, 31146, 31147, Title 49, U.S.Code, which mandated that the Secretary of Transportation adopt regulations prescribing

"minimum safety standards for commercial motor vehicles," Section 31136(a), Title 49, U.S.Code, and "Government standards for inspection of commercial motor vehicles" on an "annual or more frequent" basis. Section 31142(b), Title 49, U.S.Code. *Natl. Tank Truck Carriers, Inc. v. Fed. Hwy. Adm. of United States Dept. of Transp.* (C.A.D.C.1999), 170 F.3d 203, 204.

Although the FMCSRs were promulgated by the United States Department of Transportation, the individual states are given primary responsibility for enforcing the standards set forth in the FMCSRs through the Motor Carrier Safety Assistance Program ("MCSAP"). *Natl. Tank Truck Carriers* at 205; Section 350.201, Title 49, C.F.R. "The MCSAP is a Federal grant program that provides financial assistance to States to reduce the number and severity of accidents * * * involving commercial motor vehicles. * * * The MCSAP also sets forth the conditions for participation by States * * * and promotes the adoption and uniform enforcement of safety rules, regulations, and standards compatible with the * * * (FMCSRs)." Section 350.101, Title 49, C.F.R. To this end, the MCSAP requires that participating states adopt and enforce "State safety laws and regulations that are compatible with the FMCSRs." Section 350.201, Title 49, C.F.R. In order to be deemed "compatible" with the FMCSRs, state regulations must be "identical to the FMCSRs * * * or have the same effect as the FMCSRs." Section 350.105, Title 49, C.F.R.

The state of Ohio participates in the MCSAP and chose, as most states have done, to simply adopt the substantive portions of the FMCSRs as its own rules, rather than develop entirely new rules having the "same effect as the FMCSRs." In adopting the FMCSRs, Ohio, acting through the PUCO, promulgated Ohio Adm.Code 4901:2–5–02, which provides:

"(A) The commission hereby adopts the provisions of the motor carrier safety regulations of the U.S. department of transportation contained in Title 49, CFR Parts 382, 383, 387 and 390 through 397 including future modifications or additions, unless specifically excluded or modified by a rule of this commission * * *. All motor carriers operating in intrastate commerce within Ohio shall conduct their operations in accordance with those regulations and the provisions of this chapter. With respect to such regulations as applicable to intrastate motor carriers, any notices or requests permitted or required to be made to the U.S. department of transportation or officials thereof under Title 49, CFR Parts 390 through 397 shall instead be made to the director of the commission's transportation department."

Both parties agree that, in adopting the FMCSRs as Ohio Administrative Rules, the PUCO was required to comply with R.C. 111.15. The parties disagree, however, over precisely what the PUCO was required to do in order to comply with R.C. 111.15, which provides:

"(A) As used in this section:

"(1) 'Rule' includes any rule, regulation, bylaw, or standard having a general and uniform operation adopted by an agency under the authority of the laws governing the agency; any appendix to a rule; and any internal management rule. * * * 'Rule' includes any amendment or rescission of a rule.

"(2) 'Agency' means any governmental entity of the state and includes, but is not limited to, any board, department, division, commission, bureau, society, council, institution, state college or university, community college district, technical college district, or state community college. * * *

"* * *

"(B)(1) Any rule, other than a rule of an emergency nature, adopted by any agency pursuant to this section shall be effective on the tenth day after the day on which the rule in final form and in compliance with division (B)(3) of this section is filed as follows:

"(a) *The rule shall be filed in both print and electronic form with both the secretary of state and the director of the legislative service commission;*

"(b) *The rule shall be filed in both print and electronic form with the joint committee on agency rule review.* Division (B)(1)(b) of this section does not apply to any rule to which division (D) of this section does not apply.

"* * *

"Any rule that is required to be filed under division (B)(1) of this section is also subject to division (D) of this section if not exempted by division (D)(1), (2), (3), (4), (5), (6), (7), or (8) of this section.

"* * *

"(D) *At least sixty-five days before a* board, *commission,* department, division, or bureau of the government of the state *files a rule under division (B)(1) of this section, it shall file the full text of the proposed rule in both print and electronic form with the joint committee on agency rule review, and the proposed rule is subject to legislative review and invalidation under division (I) of section 119.03 of the Revised Code.* If a state board, commission, department, division, or bureau makes a substantive revision in a proposed rule after it is filed with the joint committee, the state board, commission, department, division, or bureau shall promptly file the full text of the proposed rule in its revised form in both print and electronic form with the joint committee. The latest version of a proposed rule as filed with the joint committee supersedes each earlier version of the text of the same proposed rule. Except as provided in division (F) of this section, a state board, commission, department, division, or bureau shall also file the rule summary and fiscal analysis prepared under section 121.24 or 127.18 of the

Revised Code, or both, in both print and electronic form along with a proposed rule, and along with a proposed rule in revised form, that is filed under this division.

"As used in this division, 'commission' includes the public utilities commission when adopting rules under a federal or state statute.

"* * *

"(E) *Whenever a state board, commission, department, division, or bureau files a proposed rule or a proposed rule in revised form under division (D) of this section, it shall also file the full text of the same proposed rule or proposed rule in revised form in both print and electronic form with the secretary of state and the director of the legislative service commission.* * * *" (Emphasis added.)

B&T argues that R.C. 111.15(B)(1) and (D) required the PUCO to file the FMCSRs that it adopted, in both print and electronic form with the Ohio Secretary of State, the Director of the Legislative Service Commission ("LSC"), and the Joint Committee on Agency Rule Review ("JCARR"); that the PUCO failed to comply with these requirements, as it filed only Ohio Adm.Code 4901:2–5–02 with the Secretary of State, LSC, and JCARR; and that the FMCSRs as adopted by the PUCO are therefore invalid.

The PUCO presents several responses to B&T's argument that it failed to comply with the filing requirements of R.C. 111.15(B)(1) and (D) in adopting the FMCSRs as Ohio Administrative Rules. The PUCO first argues that B&T failed to present any evidence that the PUCO did not file the FMCSRs with the Secretary of State, LSC, and JCARR. It is true that B&T did not present any evidence that the PUCO did not file the FMCSRs with the Secretary of State, LSC, and JCARR. However, we need not determine whether B&T had a burden of coming forward with such evidence, as the PUCO in its order in this case concedes that only the text of Ohio Adm.Code 4901:2–5–02 was ever filed with JCARR.

The PUCO also argues that, because it adopted the FMCSRs by reference in Ohio Adm.Code 4901:2–5–02(A), filing the text of that provision with the Secretary of State, LSC, and JCARR satisfied the requirements of R.C. 111.15(B) and (D). We disagree.

R.C. 111.15(A)(1) defines the term "rule" for purposes of R.C. 111.15 as "any rule, regulation, bylaw, or standard having a general and uniform operation adopted by an agency under the authority of the laws governing the agency; any appendix to a rule; * * * any internal management rule [and] any amendment or rescission of a rule." While Ohio Adm.Code 4901:2–5–02(A) may be a rule under this definition, it is not the rule at issue in the present case. Instead, the rules

which are at issue are the FMCSRs as adopted by the PUCO as Ohio Administrative Rules.

The FMCSRs as adopted by the PUCO fit squarely within the definition of "rule" contained in R.C. 111.15(A)(1). The PUCO adopted the FMCSRs under the authority of its enabling statutes, and the FMCSRs have "general and uniform operation" for motor carriers operating in Ohio. See *Ohio Assn. of Cty. Bds. of Mental Retardation & Developmental Disabilities v. Pub. Emp. Retirement Sys.* (1990), 61 Ohio Misc.2d 836, 842, 585 N.E.2d 597 (holding that a rule has "general and uniform operation" for purposes of R.C. 111.15[A][1] if it is "uniformly applied by the promulgating agency to those affected by the rule").

It is clear that the PUCO was applying the FMCSRs which it has adopted, rather than Ohio Adm.Code 4901:2–5–02(A), to B&T. The citations issued to B&T make reference to specific FMCSRs, and contain no reference to Ohio Adm.Code 4901:2–5–02. More important, it is the FMCSRs that set forth the substantive motor carrier safety standards for which B&T was cited. Ohio Adm.Code 4901:2–5–02(A) contains no substantive motor carrier safety standards. Finally, this is not a case in which the federal government has authorized Ohio to directly enforce federal regulations, and Ohio Adm.Code 4901:2–5–02 serves merely to provide notice of Ohio's intent to enforce the federal regulations. In the case of the FMCSRs, the federal government expressly chose to encourage the states to adopt motor carrier rules of their own that are "identical to, or have the same effect as, the FMCSRs," rather than to authorize the states to directly enforce the FMCSRs. Section 350.105, Title 49, C.F.R.; Section 31142, Title 49, U.S.Code. See *Bragg v. West Virginia Coal Assn.* (C.A.4, 2001), 248 F.3d 275 (holding that Congress did not authorize the states to enforce federal law where it gave states regulatory control through enforcement of their own laws). Accordingly, when the PUCO cited B&T for violating the FMCSRs it was citing B&T for violating the FMCSRs, as it had adopted them as Ohio Administrative Rules.

One of the primary purposes behind the filing requirements set forth in R.C. 111.15(B)(1) and (D) is to provide JCARR with an opportunity to review the substantive portions of new rules to determine whether the rules exceed the scope of the adopting agency's authority, conflict with other rules, or conflict with the legislative intent of the statute pursuant to which the rules are being adopted. R.C. 119.03(I)(1).[1] The PUCO argues, however, that requiring it to file the

---

1. R.C. 119.03(I)(1) provides that JCARR may:

"[R]ecommend the adoption of a concurrent resolution invalidating a proposed rule, amendment, rescission, or part thereof if it finds any of the following:

"(a) That the rule-making agency has exceeded the scope of its statutory authority in proposing the rule, amendment, or rescission;

FMCSRs that it adopted with JCARR pursuant to R.C. 111.15(B)(1) and (D) will frustrate this purpose. Essentially, the PUCO argues that providing JCARR with the substantive provisions of rules that an agency is adopting will frustrate JCARR's review of the provision by providing JCARR with unnecessary verbiage.

We fail to see how providing JCARR with the actual rules which it is expected to review, as opposed to providing JCARR with only the federal citations to the rules that it is to review, can possibly hinder JCARR's rule review process. In fact, permitting an agency to file a rule with JCARR that merely references the federal analogs to the actual rules being adopted, as the PUCO argues is the proper procedure, would seem to hinder review by requiring JCARR to obtain copies of the federal rules before it could begin reviewing the rules in question.

■ The PUCO also argues that R.C. 111.15(B)(1) and (D) should be read to permit the filing of a rule that adopts federal law by reference because it is a common practice in Ohio for both statutes and rules to adopt federal law by reference. This argument is of little value. To the extent that it is a common practice for Ohio statutes to adopt federal law by reference, this fact has no bearing on the issue here, as R.C. 111.15 has no application to the General Assembly or statutes. With respect to the PUCO's claim that it is common for Ohio agencies to adopt federal rules by reference, we note only that the fact that an act occurs does not indicate that the act is in conformity with law.

■ The PUCO also contends that allowing it to file only Ohio Adm.Code 4901:2–5–02 with the Secretary of State, LSC, and JCARR is much more efficient than requiring it to file the FMCSRs which it adopted, and that this increased efficiency comes at very little cost, as the Secretary of State, LSC, and JCARR can easily obtain the FMCSRs if they need them. We do not question these assertions; however, R.C. 111.15 was not intended to help administrative agencies adopt rules and regulations more efficiently. In fact, quite the opposite is true. In *State ex rel. Bd. of Edn. of N. Canton Exempted Village School Dist. v. Holt* (1962), 174 Ohio St. 55, 57, 21 O.O.2d 325, 186 N.E.2d 862, the Ohio Supreme Court held that a rule adopted by the Ohio School Employees Retirement Board was invalid because the rule had not been filed as required by R.C. 111.15. The

"(b) That the proposed rule, amendment, or rescission conflicts with another rule, amendment, or rescission adopted by the same or a different rule-making agency;

"(c) That the proposed rule, amendment, or rescission conflicts with the legislative intent in enacting the statute under which the rule-making agency proposed the rule, amendment, or rescission;

"(d) That the rule-making agency has failed to prepare a complete and accurate rule summary and fiscal analysis of the proposed rule, amendment, or rescission as required by section 121.24 or 127.18 of the Revised Code, or both."

court required strict adherence to R.C. 111.15's filing requirements despite the fact that the party seeking to invalidate the rule had actual notice of the rule's content and adoption. In so holding, the court noted that R.C. 111.15 had been enacted to protect the public from "bureaucratic red tape created by regulations and rules of administrative agencies."

 The FMCSRs adopted by the PUCO are "rules" for purposes of R.C. 111.15. Therefore, the PUCO was required to file the FMCSRs that it adopted with the Secretary of State, LSC, and JCARR pursuant to R.C. 111.15(B) and (D). Because the PUCO failed to comply with these filing requirements, the FMCSRs that it adopted are invalid. *Id.* Accordingly, the PUCO's finding that B&T committed twenty violations of the FMCSRs as adopted as Ohio Administrative Rules must be reversed and the twenty-eight charges dismissed.

B&T's third and fourth assignments of error are sustained.

We now turn to B&T's challenges of the PUCO's finding that B&T violated Ohio Adm.Code 4901:2-1-04.

 In its nineteenth assignment of error, B&T argues that the PUCO's finding that B&T violated Ohio Adm.Code 4901:2-1-04 is against the manifest weight of the evidence. When presented with a manifest-weight argument, an appellate court will not overturn a judgment that is supported by some competent, credible evidence going to all essential elements of the case. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

 With respect to the PUCO's finding that B&T violated Ohio Adm.Code 4901:2-1-04, the evidence submitted at the hearing before the PUCO reveals the following: On June 8, 1999, Thomas J. Drawl, a motor carrier inspector employed by the Ohio Highway Patrol's Commercial Motor Vehicle Enforcement Section, conducted a random inspection of a tractor-trailer rig being driven for B&T by an individual who the inspector testified he believed to be an owner-operator, rather than an employee of B&T. During the inspection, inspector Drawl asked the driver to produce the motor carrier tax receipt issued by the PUCO pursuant to Ohio Adm.Code 4901:2-1-04. The driver failed to produce the receipt and inspector Drawl issued a citation to B&T for violating Ohio Adm.Code 4901:2-1-04.

Ohio Adm.Code 4901:2-1-04 provides:

"(A) The public utilities commission of Ohio will issue an original tax receipt as evidence that the tax assessed by sections 4921.18 and 4923.11 of the Revised Code has been paid on a particular vehicle. The receipt will specify its effective

date. All tax receipts shall expire on the fifteenth day of july [*sic*] of the registration year for which they were issued.

"(B) The driver of a motor vehicle must present the original tax receipt for inspection by any authorized personnel of the public utilities commission or the department of public safety.

"(C) The tax receipt shall not be altered or copied by the motor carrier in any way. Any authorized personnel of the public utilities commission or the department of public safety is authorized to confiscate an altered or copied receipt on sight. A motor carrier may only transfer its tax receipts from vehicles taken out-of-service to their replacement vehicles.

"(D) Each motor carrier is required to retain records specifying the power unit to which each tax receipt was assigned."

This provision imposes a duty upon the party responsible for paying the tax imposed by R.C. 4921.18 and 4923.11 to make certain that the tax receipt issued to it by the PUCO is available for inspection by any authorized personnel of the PUCO or the department of public safety. Accordingly, the question of whether B&T was properly cited for violating Ohio Adm.Code 4901:2–1–04 turns on whether B&T was the taxable entity under R.C. 4921.18 and 4923.11 with respect to the tractor-trailer rig in question.

R.C. 4921.18 provides:

"(A) Every motor transportation company or common carrier by motor vehicle operating in this state shall, at the time of the issuance of a certificate of public convenience and necessity to it and annually thereafter on or between the first and the fifteenth days of July of each year, pay to the public utilities commission, for and on behalf of the treasurer of state, the following taxes:

"* * *

"(2) For each commercial tractor, as defined in section 4501.01 of the Revised Code, used for transporting property, thirty dollars;

"* * *

"(B) A trailer used by a motor transportation company or common carrier by motor vehicle shall not be taxed under this section.

"* * *

"(D) Any * * * commercial tractor as defined in section 4501.01 of the Revised Code, * * * with respect to which the tax imposed by this section has been paid, may be used by another motor transportation company or common carrier, or by a private motor carrier or contract carrier, without further payment of the tax imposed by this section or by section 4923.11 of the Revised Code."

Similarly, R.C. 4923.11 provides:

"(A) Every private motor carrier or contract carrier by motor vehicle operating in this state shall, at the time of the issuance of its permit, and annually thereafter on or between the first and fifteenth days of July of each year, pay to the public utilities commission for and on behalf of the treasurer of state, the following taxes:

"* * *

"(2) For each commercial tractor, as defined in section 4501.01 of the Revised Code, used for transporting property, thirty dollars;

"* * *

"(B) A trailer used by a private motor carrier or contract carrier by motor vehicle shall not be taxed under this section.

"* * *

"(D) Any * * * commercial tractor as defined in section 4501.01 of the Revised Code, * * * with respect to which the tax imposed by this section has been paid, may be used by a motor transportation company or common carrier, or by another private motor carrier or contract carrier, without further payment of the tax imposed by this section or by section 4921.18 of the Revised Code."

Pursuant to R.C. 4921.18(A)(2) and 4923.11(A)(2) every "motor transportation company," "common carrier by motor vehicle," "private motor carrier," and "contract carrier by motor vehicle" operating in Ohio must pay a $30 tax on "each commercial tractor * * * used for transporting property." For purposes of R.C. 4921.18(A)(2) and 4923.11(A)(2), a "commercial tractor" is defined as "any motor vehicle that has motive power and either is designed or used for drawing other motor vehicles, or is designed or used for drawing another motor vehicle while carrying a portion of the other motor vehicle or its load, or both." R.C. 4501.01(D). In turn, a "motor vehicle" is defined as "any vehicle * * * that is propelled or drawn by power other than muscular power or power collected from overhead electric trolley wires." R.C. 4501.01(B). Thus, the tax imposed by R.C. 4921.18(A)(2) and 4923.11(A)(2) is imposed only upon the tractor portion of a tractor-trailer rig. This fact is made even more clear by R.C. 4921.18(B) and 4923.11(B), which expressly exclude trailers used by a "motor transportation company," "common carrier by motor vehicle," "private motor carrier," or "contract carrier by motor vehicle" from the tax imposed by their respective sections.

The terms "motor transportation company" and "common carrier by motor vehicle" as used in R.C. 4921.18, and the terms "private motor carrier" and "contract carrier by motor vehicle" as used in R.C. 4923.11, are defined virtually

identically in R.C. 4921.02(A) and 4923.02(A), respectively, to include "every corporation, company, association, joint-stock association, person, firm, or copartnership, their lessees, legal or personal representatives, trustees, or receivers or trustees appointed by any court, * * * when engaged in the business of private carriage of persons or property, or both, or of providing or furnishing such transportation service, for hire, in or by motor-propelled vehicles of any kind, including trailers, over any public highway in this state * * *." Given the breadth of this definition, either a trucking company or an owner-operator could be the taxable entity with respect to a tractor owned by the owner-operator, but being used by the trucking company.

 Our conclusion that both a trucking company or an owner operator could be the taxable entity under R.C. 4921.18(A)(2) and 4923.11(A)(2), is reinforced by R.C. 4921.18(D) and 4923.11(D), which permit a tractor, on which the tax imposed by their respective sections has been paid, to be used by another "motor transportation company," "common carrier by motor vehicle," "private motor carrier," or "contract carrier by motor vehicle" without any additional taxation under R.C. 4921.18 and 4923.11. Thus, where an owner-operator has paid the tax imposed on his tractor, a trucking company may use the tractor without having to pay any further tax. However, the converse of this principle is that where a trucking company uses a tractor owned by an owner-operator on which the tax has not been paid, the trucking company must pay the tax. This complex system appears to be intended to permit owner-operators and trucking companies to contractually determine the party that is responsible for paying the tax imposed by R.C. 4921.18 and 4923.11.

In the present case, the only evidence regarding who was responsible for paying the tax on the tractor in question is inspector Drawl's testimony that he believed that the driver was an owner-operator. In the absence of evidence of an agreement with a trucking company, an owner-operator will be presumed responsible for paying the tax imposed upon his tractor by R.C. 4921.18 and 4923.11. Thus, in the instant case, the evidence indicates that the owner-operator, rather than B&T, was the entity responsible for paying the tax and, consequently, for making the tax receipt available for inspection. Accordingly, the evidence will not support the PUCO's conclusion that B&T violated Ohio Adm.Code 4901:2-1-04 by failing to make the tax receipt available.

B&T's nineteenth assignment of error is sustained.

Our resolution of B&T's third, fourth, and nineteenth assignments of error renders B&T's remaining assignments of error moot, and we decline to address them. App.R. 12(A)(1)(c).

Having sustained B&T's third, fourth, and nineteenth assignments of error, and having found B&T's remaining assignments of error to be moot, we reverse the judgment of the PUCO and remand this matter to the PUCO for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

BOWMAN and PETREE, JJ., concur.