OFFICE OF CONSUMERS' COUNSEL, APPELLANT, *v.*
PUBLIC UTILITIES COMMISSION ET AL., APPELLEES.
CITY OF CINCINNATI, APPELLANT, *v.*
PUBLIC UTILITIES COMMISSION ET AL., APPELLEES.

[Cite as Consumers' Counsel v. Pub. Util. Comm. (1981), 67 Ohio St. 2d 303.]

(Nos. 80-639 and 80-643—Decided July 22, 1981.)

*Mr. William A. Spratley,* consumers' counsel, *Mr. Douglas J. Holmes* and *Mr. Orla E. Collier,* for appellant Office of Consumers' Counsel.

*Mr. Richard A. Castellini,* city solicitor, *Mr. W. Peter Heile* and *Mr. Arnold Fieldman,* for appellant city of Cincinnati.

*Mr. William J. Brown,* attorney general, *Mr. Marvin I. Resnik* and *Ms. Jane L. Miller,* for appellee Public Utilities Commission.

*Messrs. Squire, Sanders & Dempsey, Mr. Alan P. Buchmann, Mr. William J. Moran, Mr. Richard W. McLaren, Jr.,* and *Mr. James T. Mayer,* for intervening appellee Cincinnati Gas & Electric Co.

*Per Curiam.* The three critical issues in this case are whether the commission properly: (1) included C.G. & E.'s Zimmer Nuclear Unit No. 1 and its nuclear fuel core as CWIP; (2) calculated C.G. & E.'s tax accruals which were used as an offset to the allowance made for working capital; and (3) determined C.G. & E's cost of common equity for rate of return purposes.

In resolving these issues, we are mindful of the fact that, pursuant to R. C. 4903.13, this court will not reverse an order of the commission unless it appears from the record that such order is unlawful or unreasonable. It should also be noted that this court will not disturb the findings and order of the commission unless such findings and order are manifestly against the weight of the evidence and are so clearly unsupported by the record as to show misapprehension or mistake or willful disregard of duty. *Ohio Edison Co.* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 230; *C & SOE* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 120; *Cleveland Elec. Illuminating Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403, paragraph eight of the syllabus, certiorari denied, 423 U. S. 986.

With regard to the CWIP issues, our analysis begins with R. C. 4909.15, which provides, in pertinent part:

"(A) The public utilities commission, when fixing and determining just and reasonable rates, fares, tolls, rentals, and charges shall determine:

"(1) The valuation as of the date certain of the property of the public utility used and useful in rendering the public utility service for which rates are to be fixed and determined. The valuation so determined shall be the total value as set forth in division (J) of section 4909.05 of the Revised Code, and a reasonable allowance for materials and supplies and cash working capital, as determined by the public utilities commission. *The commission may, in its discretion, permit a rea-*

*sonable allowance for construction work in progress but, in no event, may any allowance for construction work in progress be made by the commission until it has determined, after a physical inspection, that the particular construction project is at least seventy-five percent complete."* (Emphasis added.)

The only other limitation placed upon the commission's discretion in calculating a CWIP allowance is R. C. 4909.15 (E), which reads, in pertinent part:

"In no event shall an allowance for construction work in progress under division (A)(1) of this section exceed twenty per cent of the total valuation as stated in such division, not including such allowance."

Appellants challenge the CWIP allowance on several grounds which we will now review *seriatim.*

Appellant Consumers' Counsel initially contends that the commission cannot decide whether a particular construction project is 75 percent complete, unless the commissioners venture out into the field and perform the actual physical inspection themselves. This we categorically reject. Neither the statute nor prior cases from this court require such an inspection. What with the veritable plethora of ongoing CWIP projects in Ohio — indeed, there were at least 106 CWIP investigations performed by the commission staff in this proceeding alone — such a burden would transform the commissioners into a band of nomads with little or no time to devote to their general regulatory responsibilities. Appellant's argument on this point does not make good sense; it definitely would not make good law. We find that the commissioners are entitled to rely on the reports and testimony of their own staff and other experts in assessing the extent to which a particular construction project is complete.

Appellant Consumers' Counsel next challenges the commission's determination that Zimmer Nuclear Unit No. 1 is 75 percent complete. More specifically, appellant contends that the commission improperly combined the nuclear fuel core with the nuclear plant itself in order to arrive at the 75 percent completion figure.

The record, however, does not support appellant's assertion on this point. The record, rather, indicates that the commission's staff made a determination, based on a physical ex-

amination of both the plant and the fuel core, that both the plant and the fuel core, whether considered individually *or* collectively, were well in excess of 75 percent complete. The commission, after hearing testimony relating to other methodologies of calculating percentage completion of a construction project, such as the elapsed time test, the dollars obligated test and the earned man hours ratio test, see *Consumers' Counsel v. Pub. Util. Comm.* (1981), 66 Ohio St. 2d 162, adopted the conclusion of its staff that both the Zimmer facility and fuel core did, in fact, meet the 75 percent completion test. We find that this conclusion is amply supported by the record.

Appellant further submits that, assuming *arguendo* the correctness of the commission's conclusion that the Zimmer plant was 75 percent complete, subsequent events such as design changes and a "*de facto* moratorium" on the issuance of necessary licenses by the United States Nuclear Regulatory Commission (NRC), both arising out of the nuclear accidents at Three Mile Island, have rendered this 75 percent complete determination incorrect. We note, however, that, as of the date certain, March 31, 1979, and the commission's hearings, from October through December of 1979, the most reliable evidence available *at that time* supports the conclusion that the facility would be brought on-line within the projected time frame, thus legitimatizing the 75 percent complete determination. In any event, we also observe, parenthetically, that the NRC issued an initial license for the Tennessee Valley Authority's Sequoyah Unit No. 1 on September 16, 1980, thus demonstrating that the alleged moratorium never materialized.

Appellant additionally contends that the commission erred by including the nuclear fuel core as CWIP. In support of this argument, appellant (1) analogizes the nuclear fuel core to more conventional fossil fuels and (2) points to the accounting classification which C.G. & E. maintains for the core.

There was much conflicting testimony on the includibility of the nuclear fuel core in the CWIP allowance. Much of this testimony demonstrated the significant substantive differences between nuclear fuel and fossil fuel, in terms of consumption and potential renewability. After reviewing this testimony, we conclude that the commission properly exercised its discretion in including the nuclear fuel core in the

CWIP allowance. In so doing, we reinforce our ruling in *Cleveland Elec. Illuminating Co.* v. *Pub. Util. Comm., supra,* paragraph five of the syllabus, that the commission, in exercising its discretion, is not constrained by the accounting practices and policies employed by a utility.

Appellants' final challenge to the commission's CWIP determination pertains to the *amount* attributed to the rate base. Pursuant to the aforementioned limitation of R. C. 4909.15(E), the commission included $122,726,000 in the rate base. In effect, the commission included in the rate base 50 percent of the total amount in the CWIP allowance on the theory that the facility would be operational for one-half of the time that the new rates would be in effect.

Appellants argue that this $122,726,000 figure should now be revised because the Zimmer Nuclear Power Plant will not be coming on-line until much later than originally anticipated. More precisely, appellants contend that the commission committed reversible error by including the Zimmer facility as CWIP because this project will not be in service at the time the rates *sub judice* become effective, or even shortly thereafter.

However, in *Consumers' Counsel* v. *Pub. Util. Comm., supra,* this court recently recognized that whether a project will be in service at the time the rates go into effect is just one factor that a reviewing court may employ in evaluating the exercise of the commission's discretion in calculating CWIP. Indeed, in *Consumers' Counsel* v. *Pub. Util. Comm., supra,* we specifically rejected rigid criteria, such as those now advanced by appellants, and ruled that determinations of this nature can be more appropriately rendered on a case-by-case basis.

After reviewing the record and evaluating the evidence which the commission had before it at the time these hearings were conducted and this order was rendered, we find that the commission's calculation of the CWIP allowance does not amount to an abuse of discretion. Any tailoring or adjustment of the order at bar, which may be dictated, in the commission's discretion, by events viewed from the perspective of experience, can be more fairly and efficiently accomplished in subsequent rate cases.

Therefore, for all the foregoing reasons, we conclude that the commission lawfully and reasonably determined C.G. & E.'s CWIP allowance.

The second critical issue in this case pertains to appellant city of Cincinnati's contention that the commission improperly calculated C.G. & E.'s tax accruals, which were used as an offset to the allowance made for working capital, in compliance with the dictates of *Cincinnati* v. *Pub. Util. Comm.* (1954), 161 Ohio St. 395. See, also, *Ohio Utilities Co.* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 153; *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 108. *Cincinnati* v. *Pub. Util. Comm.*, *supra*, paragraph five of the syllabus, provides in pertinent part: "***customers' contributions in the form of*** deposits to secure the payment of customers' bills for service***which will be constant with reasonable certainty in the foreseeable future and which are available for investments in materials and supplies, or for use as working capital, should be used as an offset on the allowance for working capital***." In the case at bar, the commission did offset $10,812,000 for tax accruals and $328,000 for customer deposits, thus totaling $11,141,000 for customer-contributed capital.

The focal point of this working capital offset dispute concerns the methodology employed in calculating the amount to be offset. On the one hand, the commission contends, pursuant to R. C. 4909.15(A)(1), that the relevant figure is the amount of taxes paid *during the test year.* On the other hand, the appellant city of Cincinnati submits that future, post-rate increase taxes should be considered, thus resulting in a larger offset and smaller working capital allowance.

The flaw in appellant's philosophy, however, is that R. C. 4909.15 unambiguously requires that the rate base be valued "as of the date certain," not at some speculative unspecified point in time. To adopt appellant's argument would be to require the commission, in calculating the working capital offset, to engage in speculative analysis. This we refuse to sanction. In upholding the commission's calculation of the working capital offset, we have taken into consideration the fact that the commission has been careful to factor post-rate increase taxes into its order under the heading of "Authorized Increase," not under the section labeled "Operating Revenues and Expenses."

Therefore, we find that the commission properly calculated C. G. & E.'s working capital offset.

The third — and final — major issue concerns the commission's calculation of C. G. & E.'s allowable return on its common stock equity capital. The commission found, based upon the recommendation of its staff, that C. G. & E. did face a base line cost of equity of 13.09 percent. The commission subsequently adduced testimony, from a variety of witnesses, indicating that, based on issuance costs, market pressure and the need for financing flexibility, the aforementioned base line cost of equity required an adjustment of between 3.2 percent and 10 percent. In light of testimony demonstrating that C. G. & E. would be making a substantial stock offering within, approximately, the next year, the commission arrived at a total cost of equity of 14.39 percent.

Appellant city of Cincinnati now challenges this cost of equity determination as being "excessive." Bearing in mind that (1) appellant's challenge is, in essence, a factual one and (2) this court, with regard to evidentiary matters, does not review a finding and order of the commission *de novo, Masury Water Co.* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 147, 148, we conclude, upon review of the record, that the commission lawfully exercised its discretion in calculating C. G. & E.'s cost of common equity for rate of return purposes.

For all the foregoing reasons, we conclude that the findings and order of the commission are neither unreasonable nor unlawful and that the conclusions of the commission are consistent with the manifest weight of the evidence and amply supported by the record. See R. C. 4903.13; *Cleveland Elec. Illuminating Co.* v. *Pub. Util. Comm., supra.* Accordingly, the order of the commission is affirmed.

*Order affirmed.*

CELEBREZZE, C. J., W. BROWN, P. BROWN, SWEENEY, HOLMES and C. BROWN, JJ., concur.

LOCHER, J., dissenting. I dissent because the Public Utilities Commission refuses to define standards for review of CWIP matters. See *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 108, 117 (Locher, J., dissenting), and *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 66 Ohio St. 2d 162, 167 (Locher, J., dissenting).