CONSUMERS' COUNSEL, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as Consumers' Counsel *v.* Pub. Util. Comm. (1983), 4 Ohio St. 3d 111.]

(No. 82-1004—Decided April 13, 1983.)

*Mr. William A. Spratley,* consumers' counsel, *Ms. Deborah A. Ballam* and *Mr. Martin J. Marz,* for appellant.

*Mr. Anthony J. Celebrezze, Jr.,* attorney general, *Mr. Marvin I. Resnik* and *Mr. Harris S. Leven,* for appellee.

*Messrs. Squire, Sanders & Dempsey, Mr. Alan P. Buchmann* and *Mr. Richard W. McLaren, Jr.,* for intervening appellee.

*Per Curiam.* R.C. Chapter 4909 requires the commission to determine just and reasonable rates for services rendered by our state's public utilities. Consumers' Counsel raises questions of law and fact in this appeal from the commission's order, claiming the rate increase allowed therein to be unlawful and unreasonable. We consider these claimed errors under our bifurcated standard of review well-stated by Justice Paul Brown:

"As to questions of fact, this court has repeatedly enunciated the rule that orders of the commission will not be reversed unless they are manifestly against the weight of the evidence or are so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty. [Citations omitted.]

"As to questions of law, however, this court has complete, independent power of review. Legal issues are accordingly subjected to more intensive examination than are factual questions." *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 108, 110 [12 O.O.3d 115].

We address the contentions of Consumers' Counsel in the order in which they arise in the calculation of the rate increase.

As with every application for an increase in rates, the commission first determined the appropriate rate base valuation as of the date certain. R.C. 4909.15(A). Consumers' Counsel challenges the calculation of the rate base, contending the commission as a matter of law improperly failed to deduct from working capital an amount equal to the company's accrued nuclear fuel disposal account balance. At the date certain in this rate case, the accumulated balance was $3,126,000.

Since the granting of the company's 1978 application for a rate increase, the commission has allowed the inclusion in current operating expenses of deferred costs for the disposal of spent nuclear fuel used at the Davis-Besse Nuclear Power Plant. The spent fuel is presently being accumulated and stored at a temporary site, with ultimate disposal method and cost yet to be determined. It is expected that permanent disposal will occur in the late

1980's, but this future expense is allowed to be included in current operating expenses on the principle that the cost will be incurred due to the present operations of Davis-Besse. The amounts included in operating expenses are based on estimates prepared by the United States Department of Energy and these customer contributions are kept in a reserve fund by the company, available for investment. Revenues from investment of the fund are returned to the general fund.

In *Cincinnati* v. *Pub. Util. Comm.* (1954), 161 Ohio St. 395 [53 O.O. 304], paragraph five of the syllabus, this court held:

"In fixing telephone rates, *customers' contributions in the form of accurals* [*sic*] for the payment of taxes, deposits to secure payment of customers' bills for service or as advances on installation charges, and collections of rents to be paid at future dates, *which will be constant with reasonable certainty in the foreseeable future and which are available for investments* in materials and supplies, or for use as working capital, *should be used as an offset on the allowance for working capital,* including investments in materials and supplies necessary for the normal operations of the company and for plant maintenance and repair." (Emphasis added.)

The principle underlying this holding is that investors in public utilities should be permitted to earn a return only on that property for which they have supplied funds, not on funds contributed by customers. *Consumers' Counsel, supra,* at 115. By deducting such deposits from working capital, the company's cash flow generated by the customer-supplied account is offset by the hypothetically equivalent reduction in revenues caused by the smaller rate base.

Since *Cincinnati,* this court has consistently applied the principle that a utility may not earn a return on customer-supplied funds which are "constant with reasonable certainty and available for investments." *Consumers' Counsel, supra; Cleveland Elec. Illum. Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403 [71 O.O.2d 393], paragraph nine of the syllabus. Conversely, when such an account is not "constant with reasonable certainty," as with customer deposits in the form of budget billing balances, no offset against working capital and concomitant reduction in rate base are required. *Cleveland* v. *Pub. Util. Comm.* (1982), 70 Ohio St. 2d 290, 294 [24 O.O.3d 370].

In the instant case, the commission justified permitting the company to earn interest on the accrued nuclear fuel disposal account without a compensating rate base deduction by stating its intent that the monies earned be used to pay the higher costs expected when actual disposal occurs in the future. The commission speculates that the amounts charged to current customers will be insufficient to cover actual disposal costs and further speculates that the return earned on the account will be available to offset this additional expense.

We note the inherent uncertainty of the estimated cost of permanent disposal and the possibility that such costs may in fact be less than expected.

We also note the inability of the commission or company to track precisely the funds earned by this account. Given these facts, we are not persuaded that an exception to the general rule of law should apply. It is uncontroverted that the customer-supplied funds in this account are constant with reasonable certainty and are available for investments. Accordingly, working capital should be offset in the amount of the accrued nuclear fuel disposal account, thereby reducing the rate base. This, in effect, will deny the company a return on accrued customer-supplied funds. By failing to order such an offset, the commission erred as a matter of law and its decision must be reversed.

Having determined the appropriate rate base and operating expenses, the commission next considered capital structure, fixing the relative percentage of debt, preferred stock and common equity. It then determined what it believed to be the correct cost for each of these components. After the commission ascertained the cost of capital components, it assigned rates of return which must be "fair and reasonable." From these rates, an overall cost of capital is derived, which is equated with the fair rate of return, and when applied to the rate base, together with expenses, results in the permissible rates to be charged the customer.

Consumers' Counsel disputes the calculation of cost of common equity. It contends the adjustment of the baseline cost of equity to account for flotation costs[2] improperly included an increased risk to investors as a result of this court's decision in *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 153 [21 O.O.3d 96] (hereinafter *"CEI"*). In that case, this court disallowed the recovery of the costs of four cancelled nuclear plants. Consumers' Counsel here does not dispute that some adjustment was appropriate for flotation costs, but argues that the commission has misused the concept in order to guarantee a return of invested capital in the terminated units.

Whether the figure derived by the commission to reflect flotation costs is correct is a question of fact, there being no dispute that some adjustment for flotation costs is appropriate. Although Consumers' Counsel proposed a different amount, there was sufficient evidence in the record to support the commission's decision to adopt its staff's proposal. In fact, the same range for flotation costs was upheld by this court in *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 303, 310 [21 O.O.3d 191]. Moreover, nothing in the record evidences any improper considerations underlying the approved amount. Accordingly, we find the flotation cost adopted by the commission neither unreasonable nor against the manifest weight of the evidence.

With respect to the return on common equity, the commission first adopted a range of 17.02 percent to 18.13 percent. This range, derived by the commission staff, gives the commission discretion in selecting a specific point

---

[2] Flotation costs are incurred with the issuance of new or previously unissued stock and includes direct issuance costs such as underwriting fees and printing costs, and indirect costs such as dilution in the value of company stock already on the market.

within that range to adjust the return on common equity for the specific facts of the case presented. Although it typically chooses the midpoint of the recommended range, in this case the commission noted two factors which persuaded it to alter this practice. First, the selection of the projected test year as the operating period for ratemaking purposes was believed to offer the company "a better opportunity to earn its authorized return." This factor, if viewed alone, would support the selection of the low point of the recommended range.

The second factor specifically considered by the commission was "the increase in investors' perceived risk" following release of our decision disallowing recovery of the cost of the four cancelled nuclear plants. The commission had as evidence of the increased risk a relative decline in price for common stock following our announcement of that decision, and the lowering of the company's bond rating by Standard & Poor's, this court's holding being cited as a factor in that action. Consequently, the commission selected 17.30 percent as the appropriate return on common equity, a figure midway between the low point and mid-point of the recommended range.

Consumers' Counsel contends that consideration of the increased risk found to arise from our decision in *CEI* when calculating return on common equity violates the holding that ratepayers not pay for the terminated units. The determination of the rate, however, was based on empirical data presented by the company's rate of return witnesses, which testimony was considered relevant to that determination.

R.C. 4909.15(A)(2) requires the commission to determine a fair and reasonable rate of return to the utility. The question whether a decision of this court may have so increased the perceived risk to investors as to require a higher rate of return on common equity is one the commission may consider as a factor in its decision. We do not find the commission's action in this regard "so clearly unsupported by the record as to show misapprehension or mistake or willful disregard of duty" and accordingly, find no error.

Finally, in a related issue Consumers' Counsel challenges the commission's decision to authorize the utility to amortize the balances assignable to the four terminated nuclear units over an appropriate period of time not to exceed fifteen years. This book amortization does not affect the rates paid by customers. It is an accounting procedure available as an alternative to writing off the cost of the terminated facilities (the company's share being approximately $50 million) in a single year. Such bookkeeping methodology is not governed by the ratemaking statutes. See *Dayton Power & Light Co.* v. *Pub. Util. Comm.* (1983), 4 Ohio St. 3d 91. Rather, the commission has express statutory authority under R.C. 4905.13 to prescribe the manner in which a utility must keep its books of account. The authorization in this case does not contravene the decision in *CEI* and does not appear so unreasonable as to justify reversal.

Accordingly, the decision of the commission is reversed for its failure to include an offset to the rate base by the amount in the accrued nuclear fuel

disposal account, affirmed in all other respects, and the cause remanded for further proceedings in accordance with this decision.

*Judgment accordingly.*

CELEBREZZE, C.J., STEPHENSON, SWEENEY, HOLMES, C. BROWN and J. P. CELEBREZZE, JJ., concur.

LOCHER, J., concurs in part and dissents in part.

STEPHENSON, J., of the Fourth Appellate District, sitting for W. BROWN, J.

LOCHER, J., concurring in part and dissenting in part. I concur in the holding of the majority requiring that CEI remove the accrued nuclear fuel disposal account balance from the rate base. I concur in the judgment only as to the accounting treatment of the costs of the cancelled nuclear plants. Otherwise, I dissent.

In *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 153 [21 O.O.3d 96] (*"CEI"*), we refused to allow CEI to amortize as costs to be recovered from its ratepayers approximately $56,400,000 which it had invested in four cancelled nuclear power plants. Regrettably, the majority opinion signals an abject retreat from that stand. What *CEI* condemned, today's holding condones.

Our decision in *CEI* reaffirmed *the* fundamental principle of rate base analysis. That is, a plant must be *used and useful* before the PUCO includes it in the rate base.

"If, as has been argued, these are parlous times for the utilities industry, and if, therefore, in order to attract and retain investment capital, utility companies must not only be granted a fair and reasonable rate of return pursuant to statute but must also be assured the return of capital invested in failed projects that would otherwise not be recoverable under the ratemaking formula, then the commission and the utilities should petition the General Assembly to enact changes in the ratemaking structure so as to provide this extra modicum of protection for the investors. Absent such explicit statutory authorization, however, the commission may not benefit the investors by guaranteeing the full return of their capital at the expense of the ratepayers. Under the ratemaking formula now in effect consumers are not chargeable for utility investments and expenditures that are neither included in the rate base nor properly categorized as costs. What we previously stated in a rate base case is applicable to the case at bar: '* * * It is only proper that their [the investors'] venture be found operational before they commence to recoup their capital outlays from the consumers.' *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 449, 456-457 [12 O.O.3d 378]." (Bracketed material *sic.*) *CEI, supra,* at 167-168. *CEI,* therefore, holds that CEI's investors must bear the entire cost of the cancelled plants.

In this case, the PUCO expressly allowed CEI to recover an increased return on capital due to an "increase in investors' perceived risk associated with the Court's [CEI] decision." The commission accomplished this by raising the rate of return from 17.02 to 17.30 percent.[3] This approach by the PUCO allows CEI to gain indirectly, by means of an increased rate of return, what we prohibited it from receiving directly, by means of amortization, in CEI. The burden of the (supposedly) increased risk, therefore, is back on the consumers contrary to our observation in CEI that "* * * the commission may not benefit the investors by guaranteeing the full return of their capital at the expense of the ratepayers." CEI, supra, at 167.

Regrettably, today's decision marks the second time that the majority of this court has turned its back on CEI. See Consumers' Counsel v. Pub. Util. Comm. (1982), 1 Ohio St. 3d 22 ("Consumers' Counsel [1982]"). In that case, a procedural subterfuge prevailed over precedent to ensure that the utility would receive payment for its share of the expenses paid toward the same cancelled nuclear plants which were involved in CEI. Consumers' Counsel (1982), supra, at 25 (Locher, J., dissenting).

Today, this court falls prey to a combination of semantic and statistical confusion. This is ironic indeed because: (1) the United States Supreme Court dismissed CEI's appeal for want of a properly presented federal question, Cleveland Elec. Illum. Co. v. Office of Consumers' Counsel (Jan. 25, 1982), 455 U.S. 914, 71 L. Ed. 2d 455; and (2) we have recently reaffirmed the holding of CEI and upheld its constitutionality in Cleveland Elec. Illum. Co. v. Pub. Util. Comm. (1983), 4 Ohio St. 3d 107 ("CEI [1983]"): "In the present case, we are confronted with exactly the same issue arising out of exactly the same set of facts. We are no more persuaded by appellant's arguments today than we were when they were originally advanced in [CEI]. We adhere to our position taken in that case for the reasons expressed therein." CEI (1983), supra, at 108-109.

We should have summarily reversed the PUCO's holding as to investor risk and flotation costs because CEI is res judicata. That is, CEI stands for the proposition that ratepayers are not to pay for these cancelled nuclear plants. This rule should apply whether the mechanism used to subvert the "used and useful" principle is called "amortization" or anything else. The majority, however, desolates CEI.

Accordingly, I would remand this case to the PUCO for a determination as to the extent to which the rate of return includes elements of compensation for the nuclear plants and a reduction of the rate of return consistent with that determination.

---

[3] The PUCO also adjusted the rate of return upward in order to compensate CEI for flotation costs. See footnote 2 of majority opinion. We should also reverse and remand the decision of the commission for a determination of the extent to which this adjustment allows a return on investor capital in the cancelled plants and instruct the commission to reduce the rate of return accordingly.