[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Suburban Natural Gas Co.*, Slip Opinion No. 2021-Ohio-3224.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2021-OHIO-3224

IN RE APPLICATION OF SUBURBAN NATURAL GAS COMPANY FOR AN INCREASE IN GAS DISTRIBUTION RATES, FOR TARIFF APPROVAL, AND FOR APPROVAL OF CERTAIN ACCOUNTING AUTHORITY; OFFICE OF OHIO CONSUMERS' COUNSEL, APPELLANT; PUBLIC UTILITIES COMMISSION, APPELLEE; SUBURBAN NATURAL GAS COMPANY, INTERVENING APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Suburban Natural Gas Co.*, Slip Opinion No. 2021-Ohio-3224.]

*Public utilities—R.C. 4909.15(A)(1)—Gas pipeline—When fixing rates for service, Public Utilities Commission must determine the valuation of the property of the public utility that is used and useful in rendering the public-utility service as of the date certain—To be useful, the property must be beneficial in rendering service for the convenience of the public as of the date certain—Public Utilities Commission applies an incorrect formula when it considers whether the utility's investment is prudent.*

(No. 2020-0781—Submitted March 3, 2021—Decided September 21, 2021.)

APPEAL from the Public Utilities Commission of Ohio,

Nos. 18-1205-GA-AIR, 18-1206-GA-ATA, and 18-1207-GA-AAM.

_____

**DEWINE, J.**

{¶ 1} This is an appeal from a decision of the Public Utilities Commission of Ohio ("PUCO") allowing a gas company to charge its customers higher rates. At issue is whether the gas company's customers must pay for a 4.9-mile extension of the gas company's pipeline. To decide this point, the PUCO was required by statute to determine whether the pipeline extension was "used and useful" as of a specified date. R.C. 4909.15(A)(1). The PUCO determined that the extension met this "used-and-useful" test and approved the rate increase.

{¶ 2} The Office of the Ohio Consumers' Counsel opposed the rate increase before the PUCO and maintains its challenge on appeal. In its view, only two miles of the extension were used and useful and thus the PUCO erred by approving a rate increase based upon the entire 4.9-mile extension. We conclude that the PUCO did err: in evaluating the rate increase, the PUCO looked beyond whether the entire extension was used and useful on the applicable date and considered whether it was a prudent investment because it might prove useful in the future. As a consequence, we reverse the PUCO's decision and remand the case for a proper application of the used-and-useful test.

## I. Suburban builds a 4.9-mile pipeline extension

{¶ 3} The Suburban Natural Gas Company provides natural gas distribution services to residential customers in Delaware and Marion Counties, an area that has been experiencing significant population growth. On one extremely cold day in the winter of 2015, pressure in part of Suburban's pipeline dropped below 100 pounds per square inch gauge ("psig"). This was concerning—we are told 100 psig is considered the minimum pressure necessary for that part of the pipeline to maintain

2

safe, reliable service. At lower pressure levels, there is a risk of the pipeline freezing over, causing an outage that could take weeks to repair.

{¶ 4} Suburban hired an engineering firm to look at the problem. The engineers performed modeling work, examining Suburban's system and taking into account projected growth in Suburban's customer base. Ultimately, they determined that by 2018 on an extremely cold day (when the demand for gas was at its highest), pressure in the pipeline would dip to 104 psig, just above the 100-psig minimum operating pressure. By the end of 2019, the engineers projected, the pressure could drop below 78 psig.

{¶ 5} Based on the results of this modeling, Suburban decided to build a 4.9-mile pipeline extension that would be completed in time for the 2018-2019 winter. Pipeline construction must be approved by the Ohio Power Siting Board. *See* R.C. 4906.04. But by keeping the extension below five miles, Suburban was able to take advantage of an expedited approval process before the Power Siting Board. *See* R.C. 4906.03(F)(3); Ohio Adm.Code 4906-6-10. The Power Siting Board approved the extension. The board's staff report warned, however, that the extension might be longer than needed to serve current and future customers and that Suburban's cost recovery hinged on being able to demonstrate in a future rate case that the extension was not overbuilt. After receiving the Power Siting Board's signoff, Suburban built the extension and placed it into service on February 22, 2019.

## II. Proceedings before the PUCO

{¶ 6} While construction was underway, Suburban filed an application with the PUCO for a rate increase to cover the costs of the pipeline extension. Its proposed rate increase was based on a projected value of $8.9 million for the 4.9-mile extension.

{¶ 7} In weighing such requests, the PUCO is required to determine "[t]he valuation as of the date certain of the property of the public utility used and useful

or * * * projected to be used and useful as of the date certain, in rendering the public utility service." R.C. 4909.15(A)(1). In this case, the PUCO determined that date certain to be February 28, 2019.

{¶ 8} The Consumers' Counsel is the statewide legal representative for Ohio's residential ratepayers. R.C. 4911.02(B). It intervened in the proceedings at the PUCO and argued that Suburban had admitted that at most only two miles of the pipeline were used and useful as of February 28, 2019.

{¶ 9} After completing an investigation of Suburban's application, the staff of the PUCO instituted settlement discussions. Ultimately, Suburban and the PUCO staff entered into a settlement agreement that did not include the Consumers' Counsel. Under the settlement, the staff approved the rate increase based on the entire 4.9-mile extension and Suburban agreed to phase in the increase over a period of three years.

{¶ 10} Settlement agreements of this type must be approved by the PUCO. *See* Ohio Adm.Code 4901-1-30. The Consumers' Counsel filed objections to the agreement, arguing that the pipeline extension was not used and useful.

{¶ 11} The PUCO overruled the objections and approved the settlement. In doing so, the PUCO credited testimony from the engineering firm hired by Suburban. Based on this testimony, the PUCO noted that by the 2018-2019 winter, "assuming a negative five-degree temperature, additional capacity" was required to ensure adequate pressure in the system. Pub. Util. Comm. Nos. 18-1205-GA-AIR, 18-1206-GA-ATA, and 18-1207-GA-AAM, ¶ 121 (Sept. 26, 2019). It further pointed out that according to Suburban, pressure in the system dropped to 105 psig on January 21, 2019—a month before the extension was placed into service.

{¶ 12} The Consumers' Counsel did not offer its own engineering expert. Rather, it sought to use testimony from Suburban's expert to argue that the 4.9-mile extension was significantly longer than was required to meet Suburban's needs in February 2019. This engineer said he believed he had done modeling for a two-

mile extension. He further indicated that a two-mile extension seemed to be enough for the 2018-2019 winter season. He then remarked that his modeling was focused on ensuring Suburban got longevity out of the pipeline so that Suburban would not "have to come back the next year and start building again." The Consumers' Counsel also pointed to testimony that the extension would allow Suburban to serve 4,000 to 20,000 more customers in addition to the 13,500 customers that Suburban had on the date certain. It further noted that after the extension was completed, the actual pressure in the pipeline was measured at 250 psig, well above the minimum needed for safe, reliable service.

{¶ 13} The PUCO rejected the Consumers' Counsel's claim that only a two-mile extension was called for, opining:

> With regard to [the Consumers' Counsel's] argument about the precise length of the extension, we find that, while a two-mile extension may have served customers through the 2018-2019 winter, Suburban would need to immediately initiate the [Power Siting Board] regulatory process again to build additional pipeline to ensure adequate capacity to serve existing customers soon after. This approach would also increase the overall cost of necessary improvements to Suburban's distribution system, thereby increasing the rates customers pay. Importantly, [the National Association of Regulatory Utility Commissioners'] guidance on this matter notes that "utility investment is often lumpy in nature, such that it may be cost ineffective to add small increments of plant and equipment each year, rather than building to meet a longer growth horizon."

Pub. Util. Comm. Nos. 18-1205-GA-AIR, 18-1206-GA-ATA, and 18-1207-GA-AAM, at ¶ 125 (Sept. 26, 2019).

**{¶ 14}** The PUCO denied the Consumers' Counsel's application for rehearing. The Consumers' Counsel then appealed to this court, advancing two propositions of law. In its first, it argues that the PUCO erred by allowing Suburban to charge customers for property that might be useful in the future but which was not useful on the date certain. In its second, it contends that the PUCO's decision was against the manifest weight of the evidence.

### III. The PUCO erred in looking beyond the date certain when it approved the rate increase

**{¶ 15}** The PUCO is tasked with "fixing and determining just and reasonable rates" for a public utility's service. R.C. 4909.15(A). In doing so, it must follow a ratemaking formula set out in that statute. *In re Application of Duke Energy Ohio, Inc.*, 150 Ohio St.3d 437, 2017-Ohio-5536, 82 N.E.3d 1148, ¶ 16. Part of this formula tells the PUCO to determine "[t]he valuation as of the date certain of the property of the public utility used and useful * * * in rendering the public utility service for which rates are to be fixed and determined." R.C. 4909.15(A). This valuation, known as the "rate base," "represents the public utility's investment in real property, facilities (power plants, pipelines, poles, and wires), and other equipment (computers and software) it uses to serve customers." *In re Duke Energy Ohio* at ¶ 19.

**{¶ 16}** The "date certain" is the date on which the utility property is assessed to determine whether it is used and useful. R.C. 4909.15(A)(1). The PUCO sets the date certain, though the date is "determined essentially by the date at which the utility files its application for a rate increase." *Ohio Edison Co. v. Pub. Util. Comm.*, 63 Ohio St.3d 555, 559, 589 N.E.2d 1292 (1992).

### A. The used-and-useful test

**{¶ 17}** The used-and-useful test allows a public utility to recover through rates the value of that portion of its property that is " 'actually used and useful for the convenience of the public.' " *Cincinnati v. Public Util. Comm.*, 113 Ohio St.

259, 148 N.E. 817 (1925), syllabus, quoting G.C. 614-23.  Whether something is used and useful must be measured " 'as of the date certain,' not at some speculative unspecified point in time." *Office of Consumers' Counsel v. Pub. Util. Comm.*, 67 Ohio St.2d 303, 309, 423 N.E.2d 1082 (1981), quoting R.C. 4909.15(A)(1).  Thus, a public utility is not entitled to include in the rate-base valuation "property not actually used or useful in providing its public service, no matter how useful the property may have been in the past or may yet be in the future." *Office of Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d 449, 453, 391 N.E.2d 311 (1979).

{¶ 18} The used-and-useful test has been a feature of ratemaking in Ohio since 1911.  H.B. No. 325, 102 Ohio Laws 549, 556-557 (enacting G.C. 614-23, predecessor section to R.C. 4909.15).  The test has its genesis in the United States Supreme Court's decision in *Smyth v. Ames*, 169 U.S. 466, 42 L.Ed. 819, 18 S.Ct. 418 (1898).  In that case, the court articulated a constitutional standard for public-utility ratemaking that required that a utility receive a fair market value of the property being used "for the convenience of the public." *Id.* at 546.  In the court's view, anything less would have led to an unconstitutional taking. *See id.* at 523; *see also Jersey Cent. Power & Light Co. v. Fed. Energy Regulatory Comm.*, 810 F.2d 1168, 1175 (1987) (Robert Bork, J.) (discussing *Smyth*).

{¶ 19} *Smyth*'s holding presented a two-way street.  On one side, customers had to pay for the property they used for their benefit. *See Smyth* at 547.  On the other, a public utility could not receive compensation for property that did not benefit its customers. *See id.*  "Fair value" compensation was therefore due only for property used and useful for the convenience of the public. *See Jersey Cent. Power* at 1175.

{¶ 20} The Supreme Court has long since abandoned the used-and-useful test as a constitutional mandate, requiring only the end result that ratemaking be "just and reasonable." *See Duquesne Light Co. v. Barasch*, 488 U.S. 299, 310, 109

S.Ct. 609, 102 L.Ed.2d 646 (1989), citing *Fed. Power Comm. v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). Nevertheless, the test continues to be the standard that the Ohio legislature has chosen to determine whether a public utility may properly charge ratepayers for its capital investment.

### B. What it means to be "useful"

{¶ 21} Here, there is no question that the entire 4.9-mile pipeline extension was used on the date certain—gas unquestionably flowed through the pipeline extension. The question is whether the 4.9-mile extension was useful. Though the Consumers' Counsel concedes that two miles of the extension were useful as of the date certain, it disputes the usefulness of the pipeline extension's remaining 2.9 miles.

{¶ 22} The word "useful" is not defined by the statute. When a word is undefined, we look to its plain, everyday meaning. *Great Lakes Bar Control, Inc. v. Testa*, 156 Ohio St.3d 199, 2018-Ohio-5207, 124 N.E.3d 803, ¶ 8. But looking at the ordinary meaning of a word in isolation will not suffice. We instead must consider the word's ordinary meaning as used in the surrounding text. *Id.*

{¶ 23} "Useful" can be understood a few different ways. It is defined as (1) "capable of being put to use"; (2) "having utility"; (3) "ADVANTAGEOUS; *esp* : producing or having the power to produce good"; and (4) "serviceable for a beneficial end or object." *Webster's Third New International Dictionary* 2524 (2002).

{¶ 24} On one hand, then, labeling something "useful" can refer to that thing's capacity to be put to use. But that understanding makes little sense here because the statute also refers to property that is used. Presumably, "used" property is always capable of being put to use. So, understanding "useful" in this sense would render the word redundant.

{¶ 25} That leaves us with the far more sensible conclusion that "useful" in the statute means "advantageous" or "beneficial." Nothing in the statutory

framework suggests deviating from the everyday meaning of the word. And because assessing whether property is useful ensures "the reasonableness and justice of rates and charges for the service rendered by the public utilities," *see* R.C. 4909.04, the property must be beneficial in rendering service for the convenience of the public as of the date certain. *Columbus v. Pub. Util. Comm. of Ohio*, 62 Ohio St.3d 430, 436, 584 N.E.2d 646 (1992).

{¶ 26} With a proper understanding of the term "useful" in mind, we turn to the Consumers' Counsel's challenge to the PUCO's order.

C. *The PUCO misapplied the used-and-useful test when it looked beyond the date certain and considered whether Suburban's investment was prudent*

{¶ 27} The PUCO concluded that the 4.9-mile pipeline extension was used and useful on the date certain based on modeling that showed that without additional capacity, the pipeline was at risk of falling below minimally adequate pressure levels during the 2018-2019 winter. But that evidence showed only that the existing pipeline would soon be inadequate and that some extension was necessary; it didn't address the Consumers' Counsel's contention that Suburban built far more than necessary.

{¶ 28} In regard to the "precise length" of the extension, the PUCO looked not at the extension's date-certain usefulness, but at its potential to save time and money in the future. The PUCO conceded a two-mile extension may have been adequate to serve customers as of the date certain but worried that soon thereafter Suburban would have had to seek regulatory approval for another extension. It also cited guidance from the National Association of Regulatory Utility Commissioners that " 'it may be cost ineffective to add small increments of plant and equipment each year, rather than building to meet a longer growth horizon.' "

{¶ 29} The problem is that such considerations go beyond the used-and-useful test. The test measures usefulness as of the date certain, "not at some speculative unspecified point in time." *Office of Consumers' Counsel*, 67 Ohio

St.2d at 309, 423 N.E.2d 1082. By speculating about the pipeline extension's potential for saving time and money in the long run, the PUCO looked beyond the date certain, February 28, 2019, to find the disputed 2.9 miles useful.

{¶ 30} The PUCO contends it reasonably interpreted the meaning of "useful" to "include a prudently-designed pipeline extension" that would "minimize regulatory and construction costs." But we have never interpreted the term "used and useful" to encompass capital facilities that are not presently useful, even if it might be cheaper to construct them now. To the contrary, we have held that the PUCO exceeds its statutory mandate when incorporating into the rate base "unfinished projects ineligible for rate base treatment [even] if the original decision to build the facilities and the subsequent decision to cancel the projects are prudent under the circumstances." *Office of Consumers' Counsel v. Pub. Util. Comm.*, 67 Ohio St.2d 153, 166, 423 N.E.2d 820 (1981).

{¶ 31} The PUCO's reliance on the guidance from the National Association of Regulatory Commissioners and its discussion of the "lumpy nature of utility" investment is telling in this regard. The manual was prepared to serve as a guideline for state and federal regulatory utility commission personnel. It does not override applicable jurisdictional law. The PUCO is bound to follow Ohio law, not the Regulatory Commissioners' manual. *See id.* at 163.

{¶ 32} In effect, the PUCO applied what is known as the "prudent-investment" test, the most prominent alternative to the used-and-useful test. Jonathan Kahn, *Keep* Hope *Alive: Updating the Prudent Investment Standard for Allocating Nuclear Plant Cancellation Costs*, 22 Fordham Envtl.Law Rev. 43, 49-50 (2010). The used-and-useful test is forward-looking: it incorporates into the rate base only the property that has been taken by the public for its benefit. Baumol & Sidak, *The Pig in the Python: Is Lumpy Capacity Investment Used and Useful?*, 23 Energy L.J. 383 (2002); James J. Hoecker, *"Used and Useful": Autopsy of a Ratemaking Policy*, 8 Energy L.J. 303, 311 (1987), fn. 38. In contrast, the prudent-

investment test is backward-looking: it incorporates into the rate base any investments in property a public utility made, so long as that investment was prudent when it was made. Baumol & Sidak, 23 Energy L.J. at 383. That's the case even if the prudent investment never pans out for customers. Richard J. Pierce Jr., *The Regulatory Treatment of Mistakes in Retrospect: Canceled Plants and Excess Capacity*, 132 U. Pa.L.Rev. 497, 511-512 (1984). Thus, the prudent-investment test places the risk of a failed investment on the customers, who must pay so long as that investment was prudently made. Baumol & Sidak, 23 Energy L.J. at 392. In contrast, the used-and-useful test places the risk of a failed investment on a public utility because the customers are made to pay only for what they take for their benefit. *Id.* at 391-392.

{¶ 33} The used-and-useful test doesn't prohibit utilities from making capital investments based on whatever scale and time frame the utility finds the most prudent. But what it does do is limit the utility's ability to recover the costs for such investments. Only at the actual point in time in which such investments are used and useful in providing services to the ratepayers may the utility charge consumers for such capital investments. Of course, this doesn't mean that some extra capacity may never be considered useful. In an appropriate circumstance, a limited degree of reserve capacity could be useful (or beneficial) to consumers in providing protection against unforeseen contingencies in the same way that property insurance is useful to a homeowner. In evaluating such circumstances, however, the question always must be whether the property is used and useful, not whether it was a prudent investment.

{¶ 34} Certainly, the General Assembly could have opted for a prudent-investment test, instead of the used-and-useful test in R.C. 4909.15(A). Indeed, in another section of the Revised Code, R.C. 4909.154, the General Assembly provided a test for assessing compensation for a public utility's operating and maintenance expenses that is based on whether the utility's policies and practices

are imprudent. The PUCO lacks authority to "legislate in its own right" and may not substitute its own test for the one adopted by the General Assembly. *Office of Consumers' Counsel v. Pub. Util. Comm.*, 67 Ohio St.2d at 166, 423 N.E.2d 820. But that is precisely what the PUCO did when relying on the prudence of Suburban's investment.

### D. We remand for the PUCO to apply the appropriate standard

{¶ 35} The application of the relevant legal standard to the facts is something that is best left to the PUCO in the first instance. *In re Complaint of Wingo v. Nationwide Energy Partners, L.L.C.*, 163 Ohio St.3d 208, 2020-Ohio-5583, 169 N.E.3d 617, ¶ 26. Here, the PUCO departed from the proper standard by looking beyond the date certain and in considering whether the investment was prudent rather than "useful." Because the PUCO failed to properly apply the used-and-useful standard, we remand this case for it to do so. On remand, the PUCO must evaluate the evidence and determine whether the 4.9-mile pipeline extension was used and useful as of the date certain.

{¶ 36} The dissent agrees that the PUCO erred when it considered the prudence of Suburban's investment but contends that this error does not warrant a remand. The dissent essentially finds the error harmless, pointing to the portion of the PUCO's rehearing entry in which the PUCO labeled its earlier reliance on investor prudence as "additional considerations," Pub. Util. Comm. Nos. 18-1205-GA-AIR, 18-1206-GA-ATA, and 18-1207-GA-AAM, Second rehearing entry, ¶ 22 (Apr. 22, 2020). According to the dissent, the PUCO ultimately "refuted [the Consumers' Counsel's] overbuilding claim," dissenting opinion at ¶ 51, with evidence of the pipeline extension's date-certain usefulness.

{¶ 37} This characterization of the PUCO's decision is off base. The evidence cited by the dissent as having refuted the Consumers' Counsel's overbuilding claim simply showed that without any extension at all, pressure levels were forecasted to drop below the minimum safety threshold. Here's the specific

evidence of date-certain usefulness the dissent relies upon: (1) Suburban would have to "prepare for contingencies—such as cold temperatures, high winds, sustained weather events, and changes in load," dissenting opinion at ¶ 56, (2) "without the 4.9-mile extension, the pressure * * * would drop to 104.27 psig at the end of 2018, barely above the minimum-acceptable level of 100 psig," *id.* at ¶ 51, and (3) pressure "would drop to 78.72 psig in 2019 without the extension," *id.* at ¶ 51.

{¶ 38} The problem is that none of this evidence shows that a *4.9-mile extension* was necessary. It simply shows that some extension was necessary to address safety concerns and that a 4.9-mile extension would easily do the trick. But by this logic, virtually any size extension (10 miles, 15 miles, and beyond) would pass muster.

{¶ 39} The dissent rightfully notes the distinction between, on one side, a pipeline with adequate reserves and, on the other, a pipeline overbuilt with excess capacity. But we are in the dark as to which side the 4.9-mile extension lies on because the PUCO provided no analysis beyond its nod to future prudence for why the 4.9-mile pipeline extension made sense over a shorter extension.

{¶ 40} We are also troubled by the dissent's suggestion that the Consumers' Counsel needed to provide its own modeling or forecasts for its overbuilding claim. It is Suburban that seeks the benefit of a rate increase. As such, Suburban has "the burden of proof to show that the proposals in the application are just and reasonable." R.C. 4909.18; *see also* R.C. 4909.19(C); *Ohio Edison Co.*, 63 Ohio St.3d at 558-559, 589 N.E.2d 1292. And while we recognize the dissent's point that the PUCO is afforded discretion in how it responds to the evidence before it, this discretion is cabined by a statutory mandate to apply the used-and-useful test to ensure rates are in fact just and reasonable. R.C. 4909.15. The PUCO went astray of this requirement when it relied on "additional considerations" of investor prudence in approving the 4.9-mile extension. This was not harmless error.

*E. We need not consider the Consumers' Counsel's remaining challenges*

{¶ 41} As part of the settlement agreement, Suburban agreed to phase in its rate increase over three years with customer rates reflecting charges for 50 percent of the value of the extension in the first year, 80 percent of the extension in the second year, and 100 percent thereafter. The phase-in did not change the overall amount that customers would pay in the aggregate—Suburban would still recover the full value of its investment, but the recovery would be spread out over three years. And if Suburban's projections of growth are correct, it means that existing customers would ultimately pay less because as customers are added, the rates are spread out over a larger rate base. Within its first assignment of error, the Consumers' Counsel challenges the PUCO's decision to approve this phase-in, arguing that it is inconsistent with the requirement that property be valued as of the date certain.

{¶ 42} A party who seeks to challenge an order on appeal must be aggrieved by that order. *See Ohio Contract Carriers Assn. v. Pub. Util. Comm.*, 140 Ohio St. 160, 42 N.E.2d 758 (1942), syllabus. Thus, we will not reverse an order of the commission unless the party seeking reversal shows that it has been harmed by the order. *In re Application of Ohio Power Co.*, 155 Ohio St.3d 320, 2018-Ohio-4697, 121 N.E.3d 315, ¶ 9. Here, the Consumers' Counsel fails to show that it is aggrieved by the PUCO's decision to allow the phase-in of the rate increase; if anything, the phase-in would seem to work a net benefit to consumers.

{¶ 43} In its reply brief, the Consumers' Counsel suggests a possible scenario where some customers could be hurt by the phase-in. It posits that if Suburban's projections are wrong, and if instead of adding customers Suburban actually loses customers, then the remaining customers would end up paying more because the rate increase would be spread over a smaller customer base. But this argument is purely speculative: there is nothing in the record that provides any basis to predict that Suburban will lose customers. And "[w]e will not reverse a

commission order based on speculation." *In re Application of Ohio Power Co.*, 155 Ohio St.3d 326, 2018-Ohio-4698, 121 N.E.3d 320, ¶ 50.  Because the Consumers' Counsel has failed to show that it is aggrieved by the phase-in, we do not consider further its challenge to that portion of the PUCO's order.

{¶ 44} Finally, we need not consider the Consumers' Counsel's second proposition of law, in which it argues that the PUCO's decision was manifestly against the weight of the evidence.  Our conclusion that the case should be remanded for application of the proper standard renders this argument moot.

### III.  Conclusion

{¶ 45} The PUCO erred when it assessed the usefulness of Suburban's 4.9-mile pipeline extension by looking beyond the date certain and considering the prudence of Suburban's investment.  We remand for the PUCO to properly apply the used-and-useful standard.

Order reversed

and cause remanded.

O'CONNOR, C.J., and KENNEDY, FISCHER, STEWART, and BRUNNER, JJ., concur.

DONNELLY, J., dissents, with an opinion.

_____

**DONNELLY, J., dissenting.**

{¶ 46} A majority of the court has decided that appellee Public Utilities Commission of Ohio's order allowing a rate increase should be reversed and the cause remanded because the commission improperly applied the used-and-useful test in R.C. 4909.15(A)(1) in allowing intervening appellee, Suburban Natural Gas, to recover its costs for building a 4.9-mile pipeline extension.  I agree with the majority that the commission erred when it considered whether Suburban's decision to build the 4.9-mile extension rather than a shorter, two-mile extension had been prudent.  Whether the longer extension would minimize future regulatory

and construction costs is not a relevant consideration under the used-and-useful standard of R.C. 4909.15(A)(1). But despite the commission's legal error, the evidence supports the commission's finding that the entire pipeline extension was used and useful as of the date certain, which was a separate and sufficient basis for determining that Suburban was entitled to full recovery of its costs. Therefore, I dissent and would affirm the commission's order.

## ANALYSIS

{¶ 47} Under the plain language of R.C. 4909.15(A)(1), a utility may recover its investment in property from ratepayers only if the property is "used and useful" in providing service to customers "as of the date certain." As the majority notes, the dispositive question here is whether the 4.9-mile extension was useful under R.C. 4909.15(A)(1). Appellant, Office of Consumers' Counsel ("OCC"), conceded that two miles of the pipeline extension was useful and thus lawfully included in rates. OCC, however, maintains that the remaining 2.9 miles were not useful in providing service as of the date certain and that therefore, Suburban's customers should not be charged for this part of the extension.

{¶ 48} The majority adopts OCC's first proposition of law, concluding that the commission erred when it considered whether Suburban had made a prudent investment decision to build the 4.9-mile extension. Specifically, the majority holds that the commission violated R.C. 4909.15(A)(1) by relying on the longer extension's potential to save regulatory and construction costs beyond the date certain rather than looking at whether the extension was useful in providing service to customers as of the date certain. I agree with the majority that the commission should not have considered whether Suburban acted prudently when determining whether the extension met the used-and-useful test. In my view, however, the evidence supports a finding that the entire pipeline was used and useful as of the date certain, despite the commission's error in relying on the prudence of Suburban's decision. Thus, I believe that there was a sufficient basis for the

decision to allow Suburban to recover its entire investment in the 4.9-mile extension.

**Record evidence shows that the entire 4.9-mile extension
was useful as of the date certain**

{¶ 49} R.C. 4909.15(A)(1) requires the commission, when setting "just and reasonable rates," to determine the value of the utility's property that is used and useful in rendering service as of the date certain.

> Whether property is used and useful in providing service to the customers of a utility is a question which of necessity must be resolved on the basis of a case-by-case analysis. That status cannot be determined through the application of a rigid formula, but should be ascertained by the trier of the facts in light of all the circumstances.

*Ohio Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d 449, 453, 391 N.E.2d 311 (1979).

{¶ 50} The commission found that the 4.9-mile extension was used and useful as of the date certain because without the additional capacity provided by the extension, Suburban's pipeline was at risk of falling below minimally adequate pressure levels during the 2018-2019 winter. According to the majority, that "evidence showed only that the existing pipeline would soon be inadequate and that some extension was necessary; it didn't address the Consumers' Counsel's contention that Suburban built far more than necessary." Majority opinion at ¶ 27.

{¶ 51} The majority is mistaken. The commission did cite evidence that refuted OCC's overbuilding claim. Suburban's engineers forecast that by the 2018-2019 winter season Suburban would require additional capacity to ensure adequate pressure for the company's distribution system in southern Delaware County. The

commission specifically cited an August 31, 2018 model created by Suburban's engineering firm that projected how much capacity and pipeline pressure was needed to serve customers safely and reliably during the winter of 2018-2019. Pub. Util. Comm. Nos. 18-1205-GA-AIR, 18-1206-GA-ATA, and 18-1207-GA-AAM, ¶ 126 (Sept. 26, 2019). This model projected that without the 4.9-mile extension, the pressure at the Lazelle Road point of delivery would drop to 104.27 psig at the end of 2018, barely above the minimum-acceptable level of 100 psig. The model also forecast that pressure would drop to 78.72 psig in 2019 without the extension, well below the minimum safe harbor. But the model projected that with the 4.9-mile extension, the pressure would be 232.50 psig.

{¶ 52} Moreover, OCC conceded before the commission that the August 2018 model was the *only* one relevant to whether the 4.9-mile extension was used and useful as of the date certain. Although OCC argued that the projections showed the extension was not useful under R.C. 4909.15, it offered no evidence, such as its own modeling or forecasts, to refute Suburban's methodology. Instead, OCC offered testimony from only one witness, who was neither an engineer nor an expert in pipeline construction, demand forecasting, or capacity requirements.

{¶ 53} We have held that the commission should be afforded wide discretion in determining issues of capacity. *Consumers' Counsel v. Pub. Util. Comm.*, 63 Ohio St.3d 522, 530, 589 N.E.2d 1267 (1992). "Limited judicial review of an excess capacity determination is sound for the reason that while excess capacity analyses have an aura of precision about them, they are fraught with judgments and assumptions." *Consumers' Counsel v. Pub. Util. Comm.*, 67 Ohio St.2d 153, 158, 423 N.E.2d 820 (1981). *See also Cleveland v. Pub. Util. Comm.*, 63 Ohio St.2d 62, 65, 406 N.E.2d 1370 (1980) ("Since utilities must anticipate load growth years in advance to maintain adequate capacity to ensure reliable service, it is unrealistic to expect a utility to have only the precise amount of capacity needed at any given time").

{¶ 54} In the end, the commission's determination that a shorter extension would not have maintained pressure at Lazelle Road above the minimum-acceptable level of 100 psig was supported by the record and well within the discretion this court has afforded the commission in the above cases.

**The commission's finding that all 4.9 miles of the extension were necessary is consistent with the majority's definition of "useful" under R.C. 4909.15(A)(1)**

{¶ 55} The majority determines that "useful" under R.C. 4909.15(A)(1) means " 'advantageous' or 'beneficial.' " Majority opinion at ¶ 25. I agree with the majority that "extra capacity" or "[i]n an appropriate circumstance, a limited degree of reserve capacity could be useful (or beneficial) to consumers in providing protection against unforeseen contingencies in the same way that property insurance is useful to a homeowner." *Id.* at ¶ 33. And that is precisely what the commission found here.

{¶ 56} The commission noted that Suburban is a natural-gas utility engaged in providing a critical and necessary commodity. That being so, the commission found that Suburban must prepare for contingencies—such as cold temperatures, high winds, sustained weather events, and changes in load. The commission relied on engineering models that projected that Suburban needed additional capacity to transport more gas to alleviate pressure concerns at the Lazelle Road point of delivery. The commission found that without the 4.9-mile extension, "Suburban's ability to provide safe, adequate, and reliable service may have been impacted during a particularly cold stretch over multiple days and involving multiple contingencies." Pub. Util. Comm. Nos. 18-1205-GA-AIR, 18-1206-GA-ATA, and 18-1207-GA-AAM, Second rehearing entry, ¶ 126 (Apr. 22, 2020). The commission further explained that the 4.9-mile extension was necessary to provide Suburban with needed capacity at Lazelle Road to serve customers during normal

weather conditions and to maintain pressure levels when demand unexpectedly surges during the winter heating season.

{¶ 57} In applying the meaning of the word "useful" to the facts of this case, it is critical to understand that although pipelines are constructed to meet peak demand, they rarely use 100 percent of their capacity every day of the year. This means that on any given day there will likely be underutilized capacity in the pipeline. But that fact that a pipeline at times has underutilized capacity does not mean that the pipeline is not useful for purposes of R.C. 4909.15(A)(1). Rather, the additional capacity built into the pipeline enhances the reliability of the natural-gas distribution system and provides insurance for customers against service interruptions, a point that the majority concedes.

{¶ 58} These considerations do not mean that pipelines can never be overbuilt, only that the evidence in this case does not support such a finding. In the end, the commission's findings validate its conclusion that the entire length of the 4.9-mile extension was beneficial and thus "useful" under R.C. 4909.15(A)(1). Accordingly, the majority errs in holding otherwise.

**The majority's reliance on Suburban's expert does not justify reversal**

{¶ 59} The majority relies on the commission's finding that "a two-mile extension *may* have been adequate to serve customers as of the date certain but * * * that soon thereafter Suburban would have had to seek regulatory approval for another extension." (Emphasis added.) Majority opinion at ¶ 28. Suburban's expert witness did testify to this. The commission found, however, that other evidence outweighed this testimony. Specifically, the commission found on rehearing that based on a totality of the evidence presented—including the projections modeled by Suburban's engineers—the 4.9-mile extension was necessary as of the date certain to provide safe and reliable service to Suburban's customers. Thus, the commission found that the weight of the evidence supported a finding that the entire extension should be included in Suburban's rate base, and

it is not this court's function to reweigh this evidence on appeal. *Elyria Foundry Co. v. Pub. Util. Comm.*, 114 Ohio St.3d 305, 2007-Ohio-4164, 871 N.E.2d 1176, ¶ 39.

{¶ 60} The commission's finding that it would have been imprudent to build a two-mile extension because Suburban would have needed to add another extension soon after, costing ratepayers more money in the long run, was error. But the commission treated its reliance on the prudence of Suburban's investment decision as "additional considerations," Pub. Util. Comm. Nos. 18-1205-GA-AIR, 18-1206-GA-ATA, and 18-1207-GA-AAM, Second rehearing entry, ¶ 22 (Apr. 22, 2020), separate and apart from its reliance on Suburban's modeling projections. Therefore, even though I find merit in OCC's first proposition of law, the record supports the commission's finding that the entire 4.9-mile extension was useful as of the date certain, effectively rendering any error harmless.

## CONCLUSION

{¶ 61} The commission based its factual findings primarily on Suburban's modeling, and it properly applied the used-and-useful standard to this evidence. On rehearing, the commission clarified that it had cited the factors that made Suburban's management decision prudent only as "additional considerations." As a result, despite the commission's error in relying on the prudent-investment rule, this court errs in concluding that OCC has demonstrated reversible error. Therefore, I dissent. I would affirm the commission's order.

---

Bruce Weston, Consumers' Counsel, and Christopher Healey and Angela D. O'Brien, Assistant Consumers' Counsel, for appellant.

Dave Yost, Attorney General, John Jones, Section Chief, and Robert A. Eubanks and Werner L. Margard III, Assistant Attorneys General, for appellees.

Carpenter, Lipps & Leland, L.L.P., Kimberly W. Bojko, and Michael H. Carpenter, for intervening appellees.

_____